OPINION OF THE COURT
Cooke, J.
In the setting of these two appeals, in each of which defendant has been sentenced to death, we are called upon to determine the constitutionality of New York’s death penalty statute—a legal issue—not to express our views as to whether such a statute, granted that it is constitutional, is wise or advisable—a legislative concern.
I
Defendant Joseph Davis appeals directly from a judgment of the Supreme Court, Westchester County, convicting him, after a jury trial, of murder in the first degree, two counts of robbery in the first degree, two counts of robbery in the second degree and criminal possession of a weapon in the second degree, and sentencing him to death for the crime of *24 murder in the first degree and to various indeterminate terms for the other crimes.
At about 10:30 p.m. on September 17, 1974, Officer Harold Woods of the Yonkers Police Department was in plain clothes and on his way to report for duty when he stopped at an A & P in Yonkers for a container of milk. As he attempted to leave the market, one of two men who were in the process of robbing the place stopped him. When Woods identified himself as a policeman, the robber shot him in the neck causing his death five days later. Favia, the assistant manager of the A & P, testified that a man approached him, produced a gun, directed him to the cashier’s booth where Mary Cahill was preparing the night’s deposit and then ordered them to put money into a canvas bag which he carried. While placing money in the sack, Favia heard a shot at the front of the store and a voice saying "Come on, man, we have to get out of here.” Kevin Wynne, the boyfriend of Mary Cahill, related that another man, whom he identified as defendant, stood by the door; that, when a customer attempted to leave, defendant pushed him back; and that, when the customer proceeded forward again, inquired what was going on and said he was a cop, defendant took out a gun and shot him. Mary Cahill swore that, after she and Favia had placed over $5,000 into the bag, she heard a man near the front doors say "Oh, you’re a cop”, followed by an expletive and then a shot. Charlie Cola, a produce clerk, testified he saw defendant push a man in the front entrance area and say "Get back in there”, that defendant pushed the man again saying "Get back into the store”, that the man said "What are you doing? I’m a cop” and that defendant then shot him. Ann Ringler, a checker, heard a "pop” by the door, looked over and saw a man fall to the floor bleeding with defendant standing over him. Melvin Jones, an FBI informer, took the stand and stated that on September 18, 1974 he was at a bar in Manhattan when defendant and "Bo” Perkins appeared, that they told him they did something and had just "wasted” a guy up in Yonkers or Mount Vernon, that they both had .38 revolvers and money, that defendant gave him a $50 bill and also gave money to Lu, the owner of the bar who was defendant’s girl friend.
Defendant testified in his own behalf. He recalled that he flew to New Orleans on a Delta Airlines flight on September 6, 1974, that the plane arrived there in the evening and was met by defendant’s first cousin, Arthur Johnson. He stated that at *25 no time did he leave the New Orleans or Napoleonville areas of Louisiana during the period ensuing from his arrival until his arrest on September 28, 1974 and that while at New Orleans he worked with Mitchell Romar as an auto mechanic. He denied being in the City of Yonkers on September 17, that he had killed a police officer on that day and that he had met Jones during the interval in question. Arthur Johnson and his wife testified as to defendant’s living with them while in New Orleans and specifically that he was in their home both on September 17 and September 18 at the times mentioned. Arthur Johnson told of defendant’s work with Romar. Romar swore that on September 17 and 18 he had worked with defendant. Lucia Thompson, the owner of the Manhattan bar, testified that the last she saw defendant prior to trial was on September 6, 1974 when he enplaned to New Orleans, that she did not see him on September 17 or 18 and that he did not give her any money from September 6, 1974 through the remainder of that month.
On rebuttal, Danny Mese testified that on September 17 he saw a tow truck operated by a man named Mitchell and that he did not see anyone with him. A Delta Airlines stewardess testified she saw defendant on a flight from New Orleans to New York on September 11, 17 or 23.
Defendant contends that it was error for the court not to admit into evidence, unconditionally on his offer, a photograph identified as People’s Exhibit 35. Utilizing a device creating a photo montage incorporating certain features of a suspect which is then projected upon a screen, Wynne assisted in the construction of two images resembling the two men involved in the A & P robbery—"[f]irst * * * the robber” and "then the shooter”. Photographs were then taken of each projection in the same order. When asked what Exhibit 35 was, Wynne responded: "It’s supposed to be the picture of the man that shot the police officer.” He stated that the exhibit was not a photographic reproduction of the picture that was on the screen, differing in that "like the face blew up. The cheeks were larger. Like the eyebrows became lighter. As you can see, there was like a glare on the screen from the picture, and that’s pretty much what happened. Like it just blew up the face entirely.” The witness identified Exhibit 36 as "supposed to be the photograph of the robber” and said that both photos were distorted from the pictures he had seen on the screen, that "[t]hese are not the guys I picked” and that *26 "these are the photographs they handed me as being the robber here and the shooter here, and I disagreed * * * [b]ecause of the facial features, that they’re wrong.” Although the trial court ruled that it would not admit one photograph without the other, under the circumstances evinced in Wynne’s testimony, it cannot be said that the rejection of Exhibit 35 was error (see Alberti v New York, Erie & Western R. R. Co., 118 NY 77; Nies v Broadhead, 75 Hun 255, 256; Catanese v Quinn, 29 AD2d 675; McCormick, Evidence [2d ed], § 214; Richardson, Evidence [Prince—10th ed], § 137; Fisch, New York Evidence [2d ed], § 142, p 82).
 The name and address of Oliver Smith was listed in the People’s alibi notice of rebuttal. The People did not call Smith but the defendant did call him as a surrebuttal witness, whereupon he testified that he gave to the Yonkers police a signed statement dealing with the case and that he "had made [the] statement under duress.” At that point, an objection was made and sustained. In discussing the ruling, defense counsel stated, relating a conversation he had with Smith, that Smith had been taken to a precinct in New York City where he was interrogated, that a day or two later he was picked up by New York City police in the company of a Yonkers detective or two and taken to a second New York City precinct for questioning, that at this juncture he told "them” he was on parole and "they” said "Well, look, Smith, just by being in this headquarters you are in violation of parole”, that they prodded him as to when he last saw Davis, that at a fourth interview in Yonkers Smith said "Look, fellows, you write down anything you want about what I know, and I will sign it”, and that, as counsel understood it, the statement says he saw Davis in New York during the middle of September, 1974. While a party’s attempt to procure false testimony or to corrupt a witness, though collateral to the issues, is competent as an admission by acts and conduct that the party’s case is weak and its evidence dishonest (Nowack v Metropolitan St. Ry. Co., 166 NY 433, 437) and while the fact that evidence was fabricated is admissible even though the evidence itself was not used (see 1 Wharton’s Criminal Evidence [13th ed], § 218), there is no indication, much less proof, of falsification on the part of the police or misconduct such as bribery of a witness nor any "fastening” of such wrongdoing to the prosecution (see McCormick, Evidence [2d ed], § 273, p 660). Here, the *27 statement signed by Smith was not offered or received in evidence.
 Relevant evidence means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence” (Uniform Rules of Evidence, rule 401 [1974]). It tends to convince that the fact sought to be established is so (People v Yazum, 13 NY2d 302, 304). Relevance, however, is not always enough, since "even if the evidence is proximately relevant, it may be rejected if its probative value is outweighed by the danger that its admission would prolong the trial to an unreasonable extent without any corresponding advantage; or would confuse the main issue and mislead the jury; or unfairly surprise a party; or create substantial danger of undue prejudice to one of the parties” (Richardson, Evidence [Prince—10th ed], § 147, p 117; see, also, People v Harris, 209 NY 70, 82; McCormick, Evidence [2d ed], § 185, pp 438-440). Since the attempt to introduce Smith’s testimony on a collateral issue was for the obvious purpose of creating the impression that a substantial portion of the prosecution’s proof was tainted in a fashion similar to the proffered Smith account, the probative value of the testimony could be outweighed by dangers that the main issue would be obscured, by prolongation of trial and by the solid possibility of undue prejudice to the prosecution. Therefore, the discretion of the trial court was not abused (see Radosh v Shipstad, 20 NY2d 504, 508; Fisch, New York Evidence [2d ed], § 3, p 5).
There is no merit to defendant’s assertion of error because of the denial of a new trial. The newly discovered evidence which formed the basis of the motion consisted of a copy of an airline schedule, purportedly to prove that defendant could not have returned by air to New Orleans from the New York area after the commission of the crime on September 17, so as to have been seen by the Johnsons in New Orleans early on the morning of September 18. Such proof would be relevant only if one accepted the alibi testimony of defendant, his relatives and friends, which proof was not accepted by the jury. It is conceded in appellant’s brief that defense counsel was aware during trial of certain airline schedules and that "very close to the end of the trial * * * a local travel agent acquainted the defense with a publication known as the Official Airline Guide published by Reuben *28 Donnelly in Chicago.” It is a portion of this Donnelly publication which defense seeks to introduce as new evidence, yet significantly no application was made during trial for an adjournment to secure it. In any event, the evidence was not "of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant” (CPL 330.30, subd 3).
II
The second appeal involves a judgment of the Supreme Court, Kings County, convicting Joseph James of murder, first degree; murder, second degree; attempted murder, second degree; assault, first degree; criminal possession of a weapon, second degree; and escape, second degree; and sentencing him to death for murder in the first degree and to concurrent prison terms for the other crimes. This, too, is a direct appeal.
There was proof that, on the morning of September 9, 1975, James, in the custody of Officers Connor and Motchan of the New York City Department of Corrections, was escorted to the dental clinic at the Kings County Hospital for examination. At that time defendant was incarcerated awaiting trial on an unrelated murder charge. While waiting for X rays to be taken defendant, cuffed to Motchan, asked to go to the lavatory. Motchan, unarmed, went into a bathroom with defendant and removed a chain from defendant’s wrist. Connor, who was armed, remained outside. Defendant seized a pistol, which had been secreted at his request in the bathroom earlier in the day by his girl friend, and confronted Officer Motchan with the weapon. Motchan opened the door and warned his colleague that defendant had a gun, whereupon defendant shot and killed Motchan. Defendant then fired at and hit Connor twice, shot a patient-bystander and escaped from the hospital. Defendant did not take the stand.
Defendant’s brief and reply brief in this court contain points to the effect that the trial court’s Sandoval rulings constituted prejudicial error requiring a retrial and that said court violated the principles of Witherspoon v Illinois (391 US 510) in dismissing six persons in the venire. After filing said briefs, defendant’s appellate counsel, orally and in writing and with defendant’s concurrence after a discussion with trial counsel, has requested the court "not to consider, and treat as withdrawn” these arguments for relief as well as any portion of the point in said briefs to the effect defendant was not provén guilty of murder in the first degree beyond a reasonable doubt, *29 which could be construed as arguments for a new trial. While these grounds, as to which there has been such a request and withdrawal and for which a reason has been ascribed, are deemed without merit, in the context of our adversary system there is no reason to interfere with this appellate strategy involving a conscious choice not to raise certain issues (see People v De Renzzio, 19 NY2d 45, 50-51; Ennis v Le Fevre, 560 F2d 1072; cf. People v DiPiazza, 24 NY2d 342, 352; People v Castro, 19 NY2d 14, 17-18).
III.
We all agree that as to defendant Davis, while the facts support a conviction of the crime of murder in the second degree, there has not been proof of guilt beyond a reasonable doubt as to all of the elements of the crime óf murder in the first degree. After careful review, there continues to be doubt among us concerning whether the victim, Officer Woods, was acting in the line of duty when he was killed, which is one of the elements of murder in the first degree as specified by our Legislature (Penal Law, § 125.27, subd 1). Accordingly, as to defendant Davis we conclude on nonconstitutional grounds that his guilt of murder in the first degree has not been established, and thus do not reach the constitutional issue as to him.
IV
On the other hand, as to defendant James we conclude that there has been proof beyond a reasonable doubt of his guilt of murder in the first degree, for which he has been sentenced to death, and thus now consider his contention that the statutory death penalty provisions under which he was sentenced are unconstitutional. Section 60.06 of the Penal Law, pursuant to which these sentences were imposed provides that ”[w]hen a person is convicted of murder in the first degree as defined in section 125.27, the court shall sentence the defendant to death.” Thus, when read with section 125.27,[1] New York has enacted a death penalty statute which positively provides for a mandatory death sentence for all persons over 18 years of age found to have intentionally caused the death (1) of a police officer in the line of duty where defendant *30 knew or had reason to know the victim was such an officer, or (2) of an employee of a State correctional institution or local correctional facility under such circumstances (as specified in [1]), or (3) of anyone if defendant was confined or in custody for a life term or upon an indeterminate sentence with a maximum of life and a minimum of at least 15 years or if defendant had escaped from such confinement or custody and had not yet been returned.
 We approach our consideration of this issue with full recognition that the State statutes under scrutiny carry with them a strong presumption of constitutionality, that they will be stricken as unconstitutional only as a last resort and that courts may not substitute their judgment for that of the Legislature as to the wisdom and expediency of the legislation. As stated by Justice Blackmun in his dissent in Furman v Georgia (408 US 238, 411): "We should not allow our personal preferences as to the wisdom of legislative * * * action, or our distaste for such action, to guide our judicial decision in cases such as these. The temptations to cross that policy line are very great”. At the same time, it must be kept firmly in mind that this court, as other State courts, is bound by rulings of the United States Supreme Court as to the validity of State statutes under the United States Constitution (Magnolia Petroleum Co. v Hunt, 320 US 430, 438; Bourjois Sales Corp. v Dorfman, 273 NY 167, 171).
The Eighth Amendment to the United States Constitution provides that "cruel and unusual punishments [shall not be] inflicted”, and the Fourteenth Amendment by its due process clause prohibits the infliction of such punishment by a State (Francis v Resweber, 329 US 459, 463). In People v Fitzpatrick (32 NY2d 499, 512-513), in considering former death penalty statutes in this State (Penal Law, former §§ 125.30, 125.35), this court stated that "[s]ince * * * the New York statute * * * challenged * * * leaves infliction of the death penalty solely to the discretion of the jury, we conclude, in light of the Supreme Court’s reading of the Eighth Amendment in Fur-man [v Georgia] (408 U. S. 238, supra), that we have no alternative but to hold that that penalty constitutes cruel and unusual punishment within the sense of that provision”. Since that decision, New York has enacted section 125.27 of the Penal Law (L 1974, ch 367, § 5) which specifies the instances when murder in the first degree is committed and which incorporates two affirmative defenses applicable to those in *31 stances—that "defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse” and that "defendant’s conduct consisted of causing or aiding, without the use of duress or deception, another person to commit suicide.”
Since the enactment of section 125.27, the Supreme Court has issued several opinions concerning State statutes revised in an effort to conform to Furman v Georgia. In Gregg v Georgia (428 US 153), the plurality opinion of the court summarized, at page 195, that "the concerns expressed in Furman that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information”. (Emphasis added.) In Woodson v North Carolina (428 US 280, 304), it was held that "the fundamental respect for humanity underlying the Eighth Amendment * * * requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death”. In Roberts (Stanislaus) v Louisiana (428 US 325), it was made clear that this principle applies even where the crime of first degree murder is narrowly defined. There it was stated at page 332: "That Louisiana has adopted a different and somewhat narrower definition of first-degree murder than North Carolina is not of controlling constitutional significance. The history of mandatory death penalty statutes indicates a firm societal view that limiting the scope of capital murder is an inadequate response to the harshness and inflexibility of a mandatory death sentence statute.” This analysis is not based simply on the Supreme Court’s conclusion that mandatory death sentences are unduly harsh insofar as they fail to take into account mitigating circumstances; it is also based on the historical fact that "[a]t least since the Revolution, American jurors have, with some regularity, disregarded their oaths and refused to convict defendants where a death sentence was the automatic consequence of a guilty verdict” (Woodson v North Carolina, 428 US 280, 293, supra).
*32 Based on these statements, since New York’s statute provides neither for the furnishing of information, without which there cannot be consideration of the individual offender and the circumstances of a particular offense, nor standards to guide the sentencing authority in the use of that information had it been furnished, unconstitutionality is certainly indicated. Indeed, since the statute requires by its terms a mandatory death penalty for the enumerated crimes, it is indistinguishable from those death penalty statutes found unconstitutional in Woodson v North Carolina (428 US 280, supra) and Roberts (Stanislaus) v Louisiana (428 US 325, supra). (See People v Velez, 88 Misc 2d 378 [McQuillan, J.].)
Any doubt concerning the question of constitutionality, however, has now been removed and has been firmly resolved by the Supreme Court in Roberts (Harry) v Louisiana (431 US 633). It is decisive. There, Harry Roberts was indicted and convicted of first degree murder of a police officer, engaged at the time of his death in the performance of his duties, and, as required by Louisiana statute (La Rev Stat Ann, § 14:30), was sentenced to death. There, in view of prior holdings (see 431 US, at p 638, n 7), a majority of the Supreme Court, with clarity and direction and without obfuscation, stated (pp 636-637):
"To be sure, the fact that the murder victim was a peace officer performing his regular duties may be regarded as an aggravating circumstance. There is a special interest in affording protection to these public servants who regularly must risk their lives in order to guard the safety of other persons and property. But it is incorrect to suppose that no mitigating circumstances can exist when the victim is a police officer. Circumstances such as the youth of the offender, the absence of any prior conviction, the influence of drugs, alcohol, or extreme emotional disturbance, and even the existence of circumstances which the offender reasonably believed provided a moral justification for his conduct are all examples of mitigating facts which might attend the killing of a peace officer and which are considered relevant in other jurisdictions.
"As we emphasized repeatedly in Roberts and its companion cases decided last Term, it is essential that the capital-sentencing decision allow for consideration of whatever mitigating circumstances may be relevant to either the particular offender or the particular offense. Because the Louisiana *33 statute does not allow consideration of particularized mitigating factors, it is unconstitutional”. (Emphasis added.)
So, too, plainly and simply and without verbiage, because the New York statute "does not allow consideration of particularized mitigating factors” for purposes of "the capital sentencing decision” as to "the particular offender”, it is unconstitutional.
That the statutory framework may in some manner reflect various mitigating factors as defenses is not enough to save New York’s death penalty statute from constitutional infirmity. Similar defenses are found in other jurisdictions, including those whose death penalty statute has been held unconstitutional by the Supreme Court. For example, Louisiana has many of the same defenses found in the New York statutes: (1) "sudden passion or heat of blood” in given circumstances may reduce a homicide to manslaughter (La Rev Stat Ann, § 14:31, subd [1]); (2) justification is a defense to prosecution for a crime (§ 14:18); (3) incapacity to distinguish between right and wrong because of mental disease or defect is a defense (§ 14:14), and intoxication may preclude specific criminal intent (§ 14:15). Similar to New York’s defense of duress (Penal Law, § 40.00) is Louisiana’s justification defense of compulsion, but such is not a defense to murder in that jurisdiction (see La Rev Stat Ann, § 14:18, subd [6]). In addition, Louisiana has a defense of infancy (§ 14:13), as does New York (Penal Law, § 30.00), but its statute does not set forth a specific age limitation in the case of capital crimes. In this respect, however, under the recent decisions of the Supreme Court the exclusion of an entire category of offenders under 18 years of age by New York (Penal Law, § 125.27, subd 1, par [b]) from punishment by death is not a mitigating factor since such limitations do not afford individualized consideration of the offender (Rockwell v Superior Ct. of Ventura County, 18 Cal 3d 420, 438). Aside from the fact that Louisiana’s law includes many of the same defenses, examination of the statutory defenses reveals their inadequacy as a solution to the constitutional deficiencies of New York’s death penalty statute.[2]
The problem lies partly in the distinction between a defense as that term is used in criminology and mitigating factors as *34 described by the Supreme Court. The answer does not turn on whether mitigating factors may be considered at the guilt portion of the trial or whether such factors may be elevated to defenses. The problem is of greater magnitude than mere procedure or form. In a statutory framework where there is no distinct consideration of mitigating factors, there is an inherent fallacy in the notion that defenses provide the same function or are as good as or even better than separate consideration of such mitigating factors. The fundamental error in the reasoning is that defenses relate to guilt or innocence whereas a mitigating factor may be of no significance to a determination of criminal culpability. This was recognized in Gregg v Georgia (428 US 153, 190, supra), when it was noted that "[m]uch of the information that is relevant to the sentencing decision may have no relevance to the question of guilt, or may even be extremely prejudicial to a fair determination of that question.” The point is that what is urged in mitigation will often not rise to the level of a defense. For example, in considering the third question of the Texas statute, which asks whether the conduct of the defendant was unreasonable in response to any provocation by the deceased, it was remarked: "This might be construed to allow the jury to consider circumstances which, though not sufficient as a defense to the crime itself, might nevertheless have enough mitigating force to avoid the death penalty—a claim, for example, that a woman who hired an assassin to kill her husband was driven to it by his continued cruelty to her” (Jurek v Texas, 428 US 262, 272, n 7). In short, statutory defenses alone do not take the place of a distinct consideration of mitigating factors, and this is all the more so where those defenses do not include a significant portion of what first the plurality and now the majority of the Supreme Court has emphasized should be examined—the character and record of the defendant.
The plurality of the Supreme Court was careful to state that it was not suggesting that a finding of constitutionality was dependent on following exactly the procedures used in those statutes upheld by it, instead explaining that "each distinct system must be examined on an individual basis” (Gregg v Georgia, 428 US 153, 195, supra). But, except in circumstances not relevant here,[3] the common thread running through the *35 court’s analysis of statutes of other jurisdictions is that there should be a consideration of the "relevant facets of the character and record of the individual offender” (Woodson v North Carolina, 428 US 280, 304, supra) or, "the attributes of the individual offender” (Roberts [Stanislaus] v Louisiana, 428 US 325, 334, supra). This requirement was derived from the observation that traditionally a determination of what is an appropriate sentence requires an investigation of the "character and propensities of the offender” (Gregg v Georgia, 428 US 153, 189, supra, quoting from Pennsylvania ex rel. Sullivan v Ashe, 302 US 51, 55). Therefore, it was reasoned that the "futility of attempting to solve the problems of mandatory death penalty statutes by narrowing the scope of the capital offense stems from our society’s rejection of the belief that 'every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender’ ” (Roberts [Stanislaus] v Louisiana, 428 US 325, 333, supra, quoting from Williams v New York, 337 US 241, 247).
Of telling significance, the New York defenses do not take into account the character, propensity, record or attributes of the individual offender. This omission results from the simple fact that an unblemished record and evidence of prior good character has never been considered as a defense, and probably never will be. Of course, one may infer character from conduct, but the Supreme Court has indicated that a more individualized consideration is necessary. Hence, while there may be some visual or empirical satisfaction derived from counting and generally comparing the New York defenses with the mitigating factors indorsed by the Supreme Court, the fact is that these defenses do not require consideration of the character and record of the individual in respect to his sentence or punishment as mandated by the Supreme Court (see, e.g., Roberts [Harry] v Louisiana, supra).
This individualized consideration, with proper guidance and standards, is the crucial aspect of the sentencing decision. "What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine” (Jurek v Texas, 428 US 262, 276, supra). New York’s defenses simply do not present the re *36 quired information and, if the defenses are not established, the defendant must be sentenced to death. New York’s law does not permit a jury which has rejected these defenses and has found a defendant guilty of murder in the first degree to then mitigate the punishment by resurrecting the defenses. Indeed, this is implicit in our justification defense statute which states that "[t]he necessity and justifiability of * * * conduct may not rest upon considerations pertaining only to the morality and advisability of [a] statute” (Penal Law, § 35.05, subd 2; see Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law, § 35.05, p 83).
Accordingly, the argument urging constitutionality fails for two reasons: initially, because the statutory framework does not permit the consideration of legally insufficient defenses as mitigating factors, and, more importantly, because these defenses do not present sufficient information about the character and record of the individual to allow a constitutionally permissible sentencing decision. Properly viewed, it is thus apparent that our statute is a mandatory capital punishment statute of the same type as has been struck down by the Supreme Court.[4]
V
Under the Constitution of our State, in capital cases in which the sentence of death has been imposed, this court is vested with the power to and must review the facts (NY Const, art VI, §§ 3, 5; People v Carbonaro, 21 NY2d 271, 274). The scope of our inquiry into the facts in capital cases was defined in People v Crum (272 NY 348, 350): "A review of the facts means that we shall examine the evidence to determine whether in our judgment it has been sufficient to make out a case of murder beyond a reasonable doubt. We are obliged to weigh the evidence and form a conclusion as to the facts. It is not sufficient, as in most of the cases with us, to find evidence which presents a question of fact; it is necessary to go further before we can affirm a conviction and find that the evidence is of such weight and credibility as to convince us that the jury was justified in finding the defendant guilty beyond a reasonable doubt.”
*37 In summary, under the United States Constitution, the death penalty is not per se unconstitutional, but New York’s statute, as presently written, in the absence of any provision in it for consideration of relevant and particularized mitigating factors, despite its narrow categories and various statutory defenses, is unconstitutional under recent holdings of the United States Supreme Court. Since we have determined under the decisions of the United States Supreme Court, the ultimate arbiter on the question, that the sentence of death as imposed on defendant James was invalid as a matter of law, that part of the judgment of conviction must be modified (CPL 470.15, subd 4, par [c]). In addition, as noted, as to defendant Davis we have determined on nonconstitutional grounds that his guilt of murder in the first degree has not been established beyond a reasonable doubt. However, based on our review of the records, as to the respective indictment counts charging murder in the first degree, we determine that in each case there has been a showing beyond a reasonable doubt of defendant’s guilt of murder in the second degree in violation of subdivision 1 of section 125.25 of the Penal Law, and hence there should be a resentencing of each defendant.
As to appellant Davis, the judgment should be modified by vacating the sentence of death and the case remitted to Supreme Court, Westchester County, for resentencing and, as so modified, the judgment should be affirmed.
As to appellant James, the judgment should be modified by vacating the sentence of death and the case remitted to Supreme Court, Kings County, for resentencing, and, as so modified, the judgment should be affirmed.
APPENDIX
"A person is guilty of murder in the first degree when:
"1. With intent to cause the death of another person, he causes the death of such person; and
"(a) Either:
"(i) the victim was a police officer as defined in subdivision 34 of section 1.20 of the criminal procedure law who was killed in the course of performing his official duties, and the defendant knew or reasonably should have known that the victim was a police officer; or "(ii) the victim was an employee of a state correctional institution or was an employee of a local correctional *38 facility as defined in subdivision two of section forty of the correction law, who was killed in the course of performing his official duties, and the defendant knew or reasonably should have known that the victim was an employee of a state correctional institution or a local correctional facility; or
"(iii) at the time of the commission of the crime, the defendant was confined in a state correctional institution, or was otherwise in custody upon a sentence for the term of his natural life, or upon a sentence commuted to one of natural life, or upon a sentence for an indeterminate term the minimum of which was at least fifteen years and the maximum of which was natural life, or at the time of the commission of the crime, the defendant had escaped from such confinement or custody and had not yet been returned to such confinement or custody; and
"(b) The defendant was more than eighteen years old at the time of the commission of the crime.
"2. In any prosecution under subdivision one it is an affirmative defense that:
"(a) The defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant’s situation under the circumstances as the defendant believed them to be. Nothing contained in this paragraph shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime except murder in the second degree; or
"(b) The defendant’s conduct consisted of causing or aiding, without the use of duress or deception, another person to commit suicide. Nothing contained in this paragraph shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the second degree or any other crime except murder in the second degree.
"Murder in the first degree is a class A-l felony.”

. Section 125.27 of the Penal Law, entitled "Murder in the first degree”, added by section 5 of chapter 367 of the Laws of 1974 and effective September 1, 1974 (see Appendix).

. We are advised that this argument—that New York’s defenses reflect mitigating factors—was presented to the Supreme Court (see brief of the Attorney-General of State of New York as amicus curiae in Roberts [Harry] v Louisiana, supra).

. The Supreme Court has reserved the question of whether or in what circumstances mandatory death sentence statutes may be constitutionally applied to prison *35 ars serving life sentences (Roberts [Harry] v Louisiana, 431 US, at p 637, n 5, supra). Hence, we do not pass on the constitutionality of section 125.27 (subd 1, par [a], cl [iii]) of the Penal Law.

. Inasmuch as we have declared our death penalty statute unconstitutional under the United States Constitution and the decisions of the United States Supreme Court, we need not pass upon its constitutionality under the State Constitution.