THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LONNIE McLEOD, Appellant.

Second Department, June 17, 1985

**APPEARANCES OF COUNSEL**

*William E. Hellerstein* (*Irma B. Ascher* of counsel), for appellant.

*Elizabeth Holtzman, District Attorney* (*Barbara D. Underwood, Michael Gore* and *Shulamit Rosenblum* of counsel), for respondent.

**OPINION OF THE COURT**

LAWRENCE, J.

■ On this appeal we are asked to determine whether defendant, convicted for the second time of felony murder, is entitled to a third trial based upon his contention that the trial court failed to give limiting instructions to the jury with respect to any of his alleged statements. Although no objection was taken to the charge in this regard, we have reviewed the issue and conclude that under the circumstances herein, a reversal on this basis is not warranted in the interest of justice.

In a two-count indictment, defendant was charged with intentional murder (Penal Law § 125.25 [1]) and felony murder (Penal Law § 125.25 [3]), in that while acting in concert with another person actually present, he caused the death of Cradely Burkett. Upon defendant's appeal from his first conviction of felony murder,[1] this court held that one of the grounds warranting a new trial was the trial court's failure to instruct the jury, *sua sponte,* on the affirmative defense to felony murder set forth in Penal Law § 125.25 (3) (a), (b), (c), (d) (*People v McLeod,* 71 AD2d 930). At the retrial now under review, the key elements of the defense were to establish the affirmative defense to the felony murder charge, as well as to persuade the jury that defendant was not the killer and lacked the intent to kill with respect to the intentional murder charge. An essential part of this trial strategy was the utilization of defendant's version of a series of statements he made to third parties, the police and an Assistant District Attorney concerning his presence at the crime scene and his possession of Burkett's property.

The People presented the following evidence. At approximately 12:45 A.M. on August 11, 1975, Margaret Bobo, who lived with her husband, Richard Bobo, in a rear third-floor apartment at 89 Powell Street in Brooklyn, heard a noise and saw on the fire escape what appeared to be the figure of a man, who was carrying something, while he was ascending the fire escape. Upon being awakened by his wife, Richard Bobo looked out the window and saw defendant, from the waist up, pulling a television set into Cradely Burkett's apartment located on the fourth floor.[2] Richard Bobo had seen defendant once or twice before

---

1. At both trials, the charges were submitted to the jury in the alternative, to wit, if the jury found defendant guilty of felony murder, they were not to consider the intentional murder charge.

2. The People's theory was that defendant had carried the television set down the fire escape, and that when he saw that in order to reach the ground from the fire escape he would have had to jump 6 to 8 feet, defendant ascended the fire escape, reentered Burkett's apartment, and was pulling the television set into the apartment when Richard Bobo observed him.

when defendant was in the park, which was located across the street from the building. Richard Bobo went to investigate and in the hallway he met two other building residents, Marshall Kinton and Bernard Owens. On the staircase between the third and fourth floors the three men encountered defendant, who was carrying a television set downstairs. Bobo inquired about the television set and defendant stated that someone had sent him to the Washingtons' apartment (other fourth-floor tenants) to pick up the television set. Bobo then knocked upon the Washingtons' door, but no one responded. He then knocked upon Burkett's door; the force of the knocking opened the door "because it was just pulled close [sic]". Bobo saw Burkett lying on his bed with blood trickling from his throat and a small hole in his side. After shaking Burkett by the shoulders, Bobo realized he was dead. The police were then summoned.

Officer William Glynn responded to the scene. After Glynn read the *Miranda* rights to defendant, which defendant indicated he understood, Glynn searched him and found a wallet in his back pocket containing "assorted I.D. cards", belonging to Burkett, but no money. Defendant said he was safeguarding the wallet for Burkett. Glynn asked what the television set and a clock were doing in the hallway. Defendant said that he had won the items playing checkers. After Glynn escorted defendant to the 73rd Precinct, defendant was transferred to the 77th Precinct, where he first spoke with Detective Allen Flath, who took charge of the investigation.

After ascertaining from defendant that he had been advised of his *Miranda* rights, understood his rights and would answer questions, Detective Flath interrogated defendant. In his first two statements, given to Flath at 4:00 A.M. and 4:15 A.M., defendant stated, in pertinent part, that one Roy S. had given him a wallet to hold and had asked him to pick up a television set in the hallway of the top floor at 89 Powell Street. Defendant had retrieved the television set but was stopped by some tenants on his way downstairs.

Following these two statements, Flath permitted defendant to telephone his wife. After speaking with his wife, who told him to "level" with the detective, defendant offered another statement at 4:30 A.M. He explained that Roy S. had asked him to accompany him and make some money. At Burkett's apartment, Roy S. entered and several minutes later, defendant heard a scuffle in the apartment. Roy S. came out with a television set and placed it in the hallway. Defendant inquired what happened,

and Roy S. replied that he had to stab Burkett. Roy S. then handed defendant a wallet, and defendant went downstairs with the television set and wallet. Defendant admitted that he knew the television set and the wallet belonged to Burkett, but maintained that he did not know Roy S. was going to kill Burkett. Defendant speculated that Roy S. must have escaped through a window.[3]

After his statements to Flath, an Assistant District Attorney was summoned, together with a stenographer. Defendant was again advised of his *Miranda* rights and a statement was transcribed. Defendant specifically admitted that when Roy S. asked him to stand at the door, defendant then realized that they were going to steal the television set. Defendant, however, maintained that he had never entered Burkett's apartment and he did not know whether Roy S. had had a knife or screwdriver with him.[4]

After defendant finished talking with the Assistant District Attorney, and as Detective Flath finished some of the paperwork involved in the case, defendant began to talk spontaneously to Flath. For the first time, defendant admitted that when Roy S. and Burkett began to scuffle inside the apartment, defendant saw Roy S. stab Burkett in his neck. At that point Roy S. told defendant to stay in the hallway and Roy S. closed the apartment door. Ten to 15 minutes later, Roy S. brought out a television set, a brown paper bag "full of stuff", a wallet and a clock. Defendant, knowing that the wallet belonged to Burkett, put it in his own pocket and then defendant left with the television set, while Roy S. returned to the apartment. Defendant admitted that he knew that he and Roy S. were going to the apartment to steal the television set, but he claimed that he did not realize someone would be in the apartment.[5]

**3.** Defense counsel argued in summation that it was Roy S. who Margaret Bobo had seen on the fire escape and who Richard Bobo had seen in Burkett's apartment.

**4.** While both a knife and screwdriver were found at the scene, no evidence was presented connecting these weapons to the wounds found on Burkett's body. Although defense counsel originally objected to the admission of any testimony concerning a knife found in the rear courtyard of the building at 89 Powell Street, he withdrew the objection; no objection was made to the introduction into evidence of a screwdriver found submerged in "brownish" water in the kitchen sink in Burkett's apartment.

**5.** On cross-examination, Flath testified that in the course of his investigation he had spoken to Roy S. and his family. However, Flath indicated that in addition to defendant's statements, the only other evidence that there was someone else who participated in the crime was Margaret Bobo's statement that she heard a noise that sounded like two men talking in the rear yard of the building. At trial, while Margaret Bobo did not specifically deny making

Defendant's testimony on his own behalf presented the jury with another explanation for his presence at the crime scene. Between 11:30 P.M. and 12:00 A.M., on August 11, 1975, defendant, together with Roy S., whom defendant had then known for three days, went to Burkett's apartment to pick up Roy S.'s belongings. While defendant remained in the building hallway, Burkett and Roy S. stepped into the apartment's kitchen where Burkett removed some canned goods from a cabinet. Roy S. handed defendant a bag of groceries and told him to put it down in the hallway.[6] Burkett also gave a clock to defendant. From the hallway, defendant witnessed no argument or disturbance until Roy S. went into the living room and unplugged a small portable television set. Burkett blocked Roy S.'s path to the door. Roy S. put the appliance down and said, "Man, we spoke about this one time. I'm not going to talk to you about it anymore". Burkett did not move.[7] After Roy S. said a few more words, a scuffle ensued. Roy S. punched Burkett who fell against a wall and almost dropped down to one knee. When defendant asked Roy S. what he was doing, Roy S. told him not to worry and closed the apartment door. After five minutes, Roy S., carrying a television set and a wallet, came into the hallway; defendant did not see Burkett. Defendant picked up the wallet, which was on top of the television set. After noticing that it did not contain any money, defendant placed the wallet in his pocket. Roy S. then asked defendant to carry the television set downstairs. While going downstairs, Richard Bobo stopped defendant. Defendant explained that the television set belonged to Roy S. but the three tenants would not let him pass. Defendant put down the television set and the group went upstairs. Bobo went into Burkett's apartment and came out with an "ashened" look.

Defendant admitted that Officer Glynn had read him his *Miranda* rights. He testified that he told Glynn that he had played checkers with the deceased several days earlier in the park, which testimony was supported by the testimony of Burkett's brother. Defendant, however, denied that he stated that he had won the television set in the checkers game.

Defendant further claimed that at the precinct he told Flath that he and Roy S. had gone to the apartment to pick up Roy S.'s possessions and, 15 minutes later, he repeated the same story to

the statement to Flath, she denied that the noise she had heard sounded like two men talking. Roy S. was not prosecuted for the instant incident.

6. Both Richard Bobo and Officer Glynn testified to seeing a bag of groceries in the hallway.

7. Burkett could not speak because his tongue and jawbone had been removed as a result of several operations for cancer.

Flath. Defendant then testified: "I told him I wanted to call my wife * * * He told me, no, that I could not make a telephone call. I asked him could I call a lawyer. He took [*sic*] me telephone, he put it down in front of me. He said if you want to call a lawyer, you call a lawyer. I said I don't know any lawyers in the State of New York. He says well, I'm not a social worker. I'm a police officer. At this time the other officer said, let the man use the telephone. I went in the room, they called, you know, they got two phones, Detective Flath got on one phone, I had the other phone. He called my wife * * * I spoke to my wife. I told her I was being held in regard to a murder case." After he spoke with his wife, he was placed in a cell. Defendant conceded that he did consent to speak to an Assistant District Attorney, and testified that he was again advised of his rights prior to giving him a statement.

However, he disputed the accuracy of his stenographically recorded statement to the Assistant District Attorney. For example, although the transcribed statement indicated that defendant stated that he knew the television set was going to be stolen, but that he did not know it would turn out the way it did, defendant maintained he had actually said that he did not know anything was going to be stolen or that anyone was going to get hurt.

Defendant specifically asserted that he was never on the fire escape or in Burkett's apartment, did not stab Burkett, had never before seen the knife or screwdriver, and had not seen Roy S. with any weapon. According to defendant, the thought that a burglary was occurring had never crossed his mind. However, the scuffle between Burkett and Roy S. led him to believe that something was wrong. Defendant also claimed that Flath's testimony was inaccurate with regard to all of defendant's alleged statements to him.

Defendant now argues on appeal, *inter alia*, that in light of his trial testimony that he had requested counsel, the trial court should have *sua sponte* instructed the jury that if they believed defendant's testimony, they should exclude from their consideration all statements defendant allegedly made after he invoked his right to counsel. While acknowledging trial counsel's failure to object to the charge, defendant contends that since the error concerns "the very fundamental right to counsel", we should now consider the alleged error and order a new trial on this ground. We disagree.

Initially, we note that defendant's trial counsel did not request a specific charge with regard to the jury's consideration

of defendant's statements nor, as conceded by defendant, was there an objection taken to the charge as given. Accordingly, the issue of the propriety of the trial court's charge has not been preserved for appellate review as a matter of law (CPL 470.05 [2]; *see, People v Narayan,* 54 NY2d 106).

We do not agree with defendant that the challenged error involves his "fundamental right to counsel", thereby negating the need for a timely objection to preserve the error for our review as a matter of law. The cases of *People v Carmine A.* (53 NY2d 816) and *People v Antonio* (86 AD2d 614), relied upon by defendant in support of his position, are inapposite. In those cases, wherein the defendants sought to suppress their statements on the basis that during custodial interrogation their right to counsel was violated by the police, "it was the absence of counsel at the critical time that was determinative" (*People v Narayan,* 54 NY2d 106, 113, *supra*). Here, we are not dealing with a suppression issue of constitutional dimension but with an alleged error in the court's instructions to the jury. A timely request or objection made by defendant's trial counsel would have given the trial court the opportunity to reconsider its charge and cure any error. Under these circumstances, there is "no justification for departing from the requirement that trial court error * * * must be brought to the court's attention by protest timely made, at least where counsel acting on defendant's behalf is present and available to register a protest and where the error if called to the court's attention is readily susceptible to effective remedy" (*People v Narayan, supra,* at p 112).

While we have the discretionary power to reverse a judgment based upon our review of an unpreserved issue when the interest of justice so requires (CPL 470.15; *see, People v Jones,* 81 AD2d 22), the challenged charge error does not require us to do so in the instant case.

The record clearly demonstrates that defendant's trial counsel not only made a purposeful decision not to raise any right to counsel claim with respect to the voluntariness of defendant's statements, but in addition, chose to affirmatively use the statements to support defendant's own testimony.

As noted, the instant appeal involves a review of defendant's second trial. At his first trial, defendant had testified on his own behalf regarding his invocation of his right to counsel.[8] Prior to

---

**8.** At his first trial, defendant testified that he had asked for counsel before giving two statements to Detective Flath. At his second trial, defendant testified that he gave two statements to Detective Flath before asking for counsel. At both trials, defendant testified that after speaking with Detective

defendant's second trial, the Court of Appeals decided *People v Cunningham* (49 NY2d 203), in which it was held that a defendant, in custody, who requested the assistance of counsel could not thereafter be questioned in the absence of an attorney nor could he waive his right to counsel, except in the presence of counsel. However, defendant's new trial counsel at the second trial, who manifested a thorough familiarity with the record of the first trial (as evidenced by his frequent utilization of the testimony therein in attempts to impeach the credibility of witnesses who testified at both trials), chose not to pursue the right to counsel issue raised by defendant's testimony at his first trial. Even if counsel was unaware of defendant's original trial testimony, once defendant testified at his second trial, counsel did not seek to reopen the *Huntley* hearing,[9] or recall Detective Flath to the stand for further questioning on defendant's alleged request for counsel.[10]

Further, defendant's trial counsel sought to incorporate defendant's statements, which were arguably exculpatory, into the framework of the defense strategy. During his summation, defense counsel urged that the jury should adopt defendant's version of what he had said had occurred, and challenged, in part, the accuracy of the People's version of defendant's statements. Nevertheless, he also claimed that defendant's stenographically recorded statement to the Assistant District Attorney, which he read, in part, to the jury,[11] was "consistent" with

Flath, he gave a statement to an Assistant District Attorney and denied making any further statements to Detective Flath.

**9.** The record of the *Huntley* hearing held prior to the first trial indicates that the police witnesses and the Assistant District Attorney testified without contradiction to the giving of the constitutional preinterrogation warnings to defendant and the waivers by defendant of his rights. Defendant did not testify at the hearing and produced no witnesses. Thus, the undisputed hearing evidence does not provide a factual basis for determining that any of defendant's statements should have been suppressed on the basis that they were obtained in violation of his right to counsel. As we have held, "Evidence subsequently admitted on trial generally cannot be used to undermine the determination of a suppression court rendered after a pretrial hearing * * * This is especially true where there has been no adequate showing to justify the defendant's failure to produce such evidence at the hearing (see CPL 710.40, subd 4). Here, no such showing was made" (*People v Smith*, 89 AD2d 881, 882). On the instant appeal, defendant does not challenge the denial of his suppression motion, nor the admission into evidence of his statements as testified to by the witnesses on the People's direct case.

**10.** On neither direct nor cross-examination was Detective Flath questioned concerning whether defendant had asked for counsel at the same time he asked to speak with his wife.

**11.** Defense counsel quoted the following part of defendant's statement to the Assistant District Attorney as transcribed:

" 'Question: Were you with Roy when he went into the apartment?

defendant's trial testimony that he had nothing to do with Burkett's murder and that he had not been armed, he did not know that his companion, Roy S., was armed and he had not anticipated any violence against Burkett. At no time did defense counsel argue that the jury should disregard any of the statements made by defendant, as testified to by the People's witnesses, on the ground that they were obtained in violation of defendant's right to counsel.

In addition, contrary to defendant's contention on appeal, he was not entitled to a charge that any statements elicited from him after he invoked his right to counsel could not be considered by the jury. Under the circumstances herein, defendant would only have been entitled to have the jury instructed that if they found defendant had requested counsel, then his subsequent statements, unless found to be spontaneous, could not be considered on the issue of his guilt, but only on the issue of his credibility. If the jury found that defendant's subsequent statements were spontaneous, even though made after he invoked his right to counsel, the statements could be considered on the issue of his guilt (*see, People v Washington,* 51 NY2d 214; *People v Cunningham,* 49 NY2d 203, 210, n 2, *supra*).

▮ Thus, in light of defendant's trial strategy, which was to present to the jury all of his statements for their determination on the issue of the credibility of the witnesses, the trial court did not err in failing to give, *sua sponte,* limiting jury instructions on the use of defendant's statements allegedly taken in violation of his right to counsel (*cf. People v Davis,* 43 NY2d 17, 29, *cert denied* 435 US 998; *People v De Renzzio,* 19 NY2d 45, 50). "If * * * a lawyer chooses not to raise a point of constitutional law in a professionally competent defense, either because he believes he could use material affirmatively to advantage or because he

---

" 'Answer: I stood in the hallway. I was with Roy when he went into the apartment. He went into the apartment, into the kitchen, and he asked the guy for some water, and the guy gave him some water from the kitchen. They started scuffling, and so forth, and I asked Roy, "what the hell are you doing?" and he said "just stay there until I get back."

" 'I stood there, and I waited for about five or ten minutes. I never entered the apartment myself. He came back to the door. So when he came back to the door, he put the T.V. in the hallway and he said, "will you take this downstairs and wait for me on the stoop". And I said, "what's wrong?" He said, "I had to stab that bastard".

" 'I picked up the television and I went down the stairs, and when I was on the stoop, two guys came up. Both had pistols. One had a small one and the other one said, "where you going?" and I said, "I'm going downstairs". And he said, "where did that T.V. come from?" And I said, "that's Roy Junior's television". And he said, "where is Roy Junior at?" and I said,"I don't know". He said, "we'll hold it in here". From that point on I didn't see Roy Junior.' "

believes it better for his client not to raise it, we would work fundamental changes in the adversary system if we determine he should have done that which he had decided advisedly not to do" (*People v De Renzzio, supra,* at p 51).

We further find that the jury could properly conclude that defendant had failed to establish the affirmative defense to the felony murder charge by a preponderance of the credible evidence.

Defendant's other contentions have been considered and found to be without merit.

Accordingly, the judgment should be affirmed.

MANGANO, J. P., O'CONNOR, WEINSTEIN and RUBIN, JJ., concur.

Judgment of the Supreme Court, Kings County, rendered March 28, 1980, affirmed.