*87 OPINION OF THE COURT
Joseph E. Fahey, J.
The defendant, John Couser, is charged along with James Stanback, in 7 counts of an 18-count indictment with the crimes of conspiracy in the second degree in violation of section 105.15 of the Penal Law; murder in the first degree in violation of section 125.27 (1) (a) (vii) (one count) and section 125.27 (1) (a) (v) (one count) of the Penal Law; murder in the second degree in violation of section 125.25 (1) of the Penal Law; attempted murder in the first degree in violation of sections 110.00 and 125.27 (1) (a) (v) of the Penal Law (two counts) and attempted murder in the second degree in violation of sections 110.00 and 125.25 (1) of the Penal Law (two counts), and is charged alone in one count with the crime of murder in the second degree in violation of section 125.25 (1) of the Penal Law. On October 6, 1997, the defendant Stanback entered a plea of guilty to murder in the second degree as charged in count six in full satisfaction of the indictment.
The indictment arises out of the killing of Virginia Hackett and the shooting of John Paul Jones and Eugene Jones on February 23, 1997 at 131-V2 Shonnard Street in the City of Syracuse by Stanback and one Quentin Jenkins who went to the Hackett residence with two others allegedly for the purpose of killing James Hackett. It is alleged that the reason James Hackett was to be killed is because he was to testify against the defendant Couser in a trial scheduled in Monroe County in which Couser was charged with attempting to kill James Hackett on a prior occasion.
The defendant moves to dismiss all of the substantive counts he is charged with upon the claim that the evidence before the Grand Jury was insufficient to establish that he shared his coconspirators’ intent to kill Virginia Hackett or that he attempted to cause Eugene and John Paul Jones’ deaths. In support of this contention, the accused argues that the “command” which Couser allegedly gave to Stanback set forth in count two and the “order” alleged in count three to Stanback were limited to killing James Hackett and did not encompass the victims in the indictment.
In addition, he contends that since he was not present at the scene of the shooting or did not participate in the decision to shoot the victims, he cannot be held liable for the crimes charged.
*88 The most troublesome issue presented by these counts is whether there is a sufficiently precise meaning concerning the term “command” in the statute.
Section 125.27 (1) (a) (vii) provides:
“A person is guilty of murder in the first degree when:
“1. With the intent to cause the death of another person, he causes the death of such person or of a third person; and “(vii) the victim was killed while the defendant was in the course of committing or attempting to commit and in furtherance of robbery, burglary in the first degree or second degree, kidnapping in the first degree, arson in the first degree or second degree, rape in the first degree * * * sexual abuse in the first degree, aggravated sexual abuse in the first degree or escape in the first degree * * * or in the course of and furtherance of immediate flight after committing or attempting to commit the crime of murder in the second degree; provided, however, the victim is not a participant in one of the aforementioned crimes and, provided further that, unless the defendant’s criminal liability under this subparagraph is based upon the defendant having commanded another person to cause the death of the victim or intended victim pursuant to section 20.00 of this chapter, this subparagraph shall not apply where the defendant’s criminal liability is based upon the conduct of another pursuant to section 20.00 of this chapter”.
In enacting this statute, the Legislature sought to craft a felony murder provision like that set forth in section 125.25 (3) of the Penal Law, albeit with a significantly expanded list of predicate felonies. Moreover, while section 125.25 (3) (a) of the Penal Law makes it an affirmative defense that the accused, “Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof’, this section only imposes accessorial liability for the crime where the People have proven as an element that the accused “commanded another person to cause the death of the victim or intended victim”. (Penal Law § 125.27 [1] [a] [vii].) Unfortunately, neither the Legislature nor the courts have given any guidance about what constitutes a “command” under this statute.
A statute which makes a defendant death eligible: “[must contain] an aggravating circumstance [which] generally narrow [s] the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.” (Zant v Stephens, 462 US 862, 877.)
*89 In Gregg v Georgia (428 US 153, 189 [1976]) the Court held: “where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.”
While the section at issue initially appears to fulfill these requirements since it narrows the accomplice liability to a single concept, “command”, and places the burden of establishing it on the People, the failure to define what constitutes a “command” either under section 20.00 or section 125.27 (1) (a) (vii) of the Penal Law renders the statute impermissibly vague.
The defendant correctly points out that except in People v Mateo (175 Misc 2d 192 [Monroe County Ct 1997]), the courts of New York have failed to provide any judicial construction to this term. The legislative memoranda summarizing the provisions of section 125.27 of the Penal Law offered no illumination of what was contemplated in the choice of the term “command” borrowed from section 20.00 of the Penal Law. This was readily apparent to the Practice Commentators who observed: “but, what constitutes a command [under this section] is likely to engender significant litigation.” (Donnino, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law § 125.27, at 390.)
The arguments and counterarguments proffered by the defendant and the People about what might be contemplated by the use of this term only serves to underscore the vagueness of the term.
The People invite the court to adopt the holding in People v Mateo (supra, at 201), in which the court opined:
“The defendant also challenges the phrase ‘commanded another person’ as being unconstitutionally vague. The defendant’s argument is unpersuasive. The term ‘command’ has been used in the Penal Law for many years under section 20.00. This phrase, under Penal Law § 125.27 (1) (a) (vii), limits the application of accessorial liability to those situations where an individual commands another person to intentionally cause the death of another individual.
“Here the commonsense meaning of ‘command’ should be applied: ‘To direct, with authority. Power to dominate and control.’ (Black’s Law Dictionary 267 [6th ed 1990].) The use of the phrase ‘commanded another person’ under the statute is sufficient to put the defendant on notice that it is a crime to or *90 der * * * the death * * * This phrase also limits the type of conduct that can be charged under this statute by law enforcement personnel because of the limited application of accessorial liability.”
It is noteworthy that the People not only did not provide this definition of “command” to the Grand Jury, but that they provided the Grand Jury with no definition, apparently leaving it to them to apply their own individual notions of what that term meant.
The problem with the analysis in Mateo (supra) is that while Judge Connell correctly observes that the term has been included in section 20.00 of the Penal Law since 1965, and it limits the application of the type of accessorial liability which can be charged under this statute, it still begs the question of what constitutes a “command”. Additionally, the utilization of the “commonsense” meaning derived from Black’s Law Dictionary 267 (6th ed 1990) invites grand jurors and trial jurors throughout the State to apply their own personal subjective interpretation in determining the existence or nonexistence of an aggravating factor in a capital case.[1] While the Black’s Law Dictionary definition may be useful in establishing agency principles in a civil case, more is required under a capital statute lest a jury be given the type of unbridled discretion condemned in Furman v Georgia (408 US 238 [1972]) and proscribed in Gregg v Georgia (428 US 153, supra).
No better example of the problems posed exists than in the instant case. The relationship established between Couser and Stanback before the Grand Jury is murky at best. While Stan-back appears to have acted at the behest of Couser, his motivation in doing so is a mystery. No testimony was elicited explaining if Stanback acted out of fear, favor, friendship, for profit or *91 otherwise. While it is possible to say Couser solicited Stan-back, it is impossible to say whether Stanback’s actions were requested, importuned or commanded by Couser. The proof before the Grand Jury is both legally and factually insufficient on this issue, and the evidence that Couser “commanded” Stan-back absent a clear definition of “command” is speculative.
No person has been executed in New York since 1963. In 1973, in People v Fitzpatrick (32 NY2d 499), the New York Court of Appeals, following Furman v Georgia (408 US 238, supra), abolished capital punishment in New York. In 1974 (L 1974, ch 367), the Legislature passed a new murder in the first degree statute (Penal Law former § 125.27) in an attempt to satisfy the requirements of Furman (supra), which made the imposition of the death penalty mandatory in certain cases. This statute was struck down by the Court of Appeals four years later in People v Davis (43 NY2d 17 [1978]), based upon the Supreme Court holding in Woodson v North Carolina (428 US 280 [1975]) and Roberts v Louisiana (428 US 325 [1975]). No successor capital statute was passed by the Legislature until the instant enactment which became effective September 1,1995. There has, therefore, been an extended moratorium on capital litigation in New York and none of the several courts, trial level or appellate, have had the opportunity to pass upon the considerable developments of capital case law since the Supreme Court determined it to be constitutional in Gregg v Georgia (428 US 153), except in the Davis case (supra). Because the common thread initially spun in Woodson v North Carolina (428 US 280 [1975], supra, decided the same day as Gregg v Georgia, 428 US 153 [1975]), that “the Court acknowledged what cannot fairly be denied — that death is a punishment different from all other sanctions in kind rather than degree” (428 US 280, at 303-304, [Stewart, J.]) has been woven into an intricate web of capital case principles, the traditional test for determining the constitutionality of a penal statute here in New York, that “[flirst, the statute must provide sufficient notice of what conduct is prohibited; second, the statute must not be written in such a manner as to permit or encourage arbitrary and discriminating law] enforcement [citations omitted]” (People v Bright, 71 NY2d 376, 382), is not a sufficient yardstick by which one can impose liability under a capital statute. Culpability under a statute which makes a defendant death eligible must be measured in accordance with the principles of individualized sentencing enunciated by the United States Supreme Court in Gregg (supra), Woodson *92 (supra) and their progeny so that arbitrary and capricious infliction of the penalty resulting from unchanneled discretion is avoided.
In declining to adopt the reasoning in Mateo (supra), this court is mindful of Justice Stewart’s words in Godfrey v Georgia (446 US 420, 427-428):
“A capital sentencing scheme must in short provide a ‘ “meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many” ’ * * *
“This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State’s responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates ‘standardless [sentencing] discretion’ * * * by ‘clear and objective standards’ that provide ‘specific and detailed guidance,’ and that ‘make rationally reviewable the process for imposing a sentence of death.’ ”
In light of the foregoing, to the extent that this statute seeks to impose accessorial liability through the “command” term borrowed from section 20.00, this court believes that the language of section 125.27 (1) (a) (vii) runs afoul of the due process guarantees of both the Fourteenth Amendment to the United States Constitution, as well as article I, § 6 of the New York Constitution and count two is dismissed.
[Portions of opinion omitted for purposes of publication.]

. A review of the definitions of the other terms contained in section 20.00 of the Penal Law contained in Black’s Law Dictionary (6th ed 1990) further illuminates the somewhat synonymous, if not circular, meaning these terms have, e.g.:
Request — “To ask for something or for permission or authority to do, see, hear, etc., something; to solicit.” (Id., at 1304.)
Importunity — “Pressing solicitation; urgent request”. (Id., at 755.)
Solicit — As used in context of solicitation to commit a crime; term means to command, authorize, urge, incite, request, or advise another to commit a crime.” (Id., at 1392.)
Thus, if Black’s Law Dictionary is to be the source of the definition of “command”, it would render nugatory the Legislature’s attempt to impose a single theory of liability pursuant to section 20.00 of the Penal Law, all terms contained in that section, would by definition be interchangeable.