# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 10
The People &c.,
     Respondent,
   v.
Darryl Watts,
     Appellant.

Rachel L. Pecker, for appellant.
Joshua P. Weiss, for respondent.
Mental Hygiene Legal Service, amicus curiae.

CANNATARO, J.:

The Sex Offender Registration Act (SORA) requires that every person convicted of a sex offense be given a risk-level classification corresponding to their assessed likelihood of recidivism and potential danger to the community. This risk level, in turn, determines

the scope of information available to the public concerning the offender. To protect against erroneous classification, judicial determination of an offender's risk level can occur only after the offender has been provided notice, counsel, disclosure of relevant information, and an opportunity to object and present evidence at a hearing, at which the People must prove the appropriateness of the classification by clear and convincing evidence. An offender's risk level is also subject to re-evaluation on an annual basis. The primary question on this appeal is whether due process precludes a court from determining a sex offender's risk level when there is a possibility that the offender— although represented by counsel and provided the other protections listed above—may lack capacity to fully comprehend risk-level assessment proceedings. We hold that the many safeguards already provided under SORA minimize the risk of inaccurate risk-level classification and adequately balance the competing private and State interests in these civil proceedings.

I.

In July 2011, defendant Darryl Watts was arrested and charged with various offenses, including sexual abuse in the first degree and assault in the second degree, after he knocked a 66-year-old woman to the ground and attempted to rape her (*see* Penal Law §§ 120.05 [12], 130.65 [1]). Defendant, who suffers from severe schizophrenia and psychosis, "was responding to internal voices" and claimed that "the victim was chosen for him." Six days after his arrest, a competency examination was conducted pursuant to CPL article 730 and Supreme Court determined that defendant was not mentally fit to stand trial. He was therefore placed in the custody and care of the Office of Mental Health (OMH),

where he remained for more than five years and underwent six additional competency examinations.[1]  In February 2017, after he was examined for a seventh time and found competent to stand trial, defendant pleaded guilty to sexual abuse and assault.  The court sentenced him to a determinate term of incarceration of six years, followed by 10 years of post-release supervision.

Defendant's sexual abuse conviction subjected him to the registration and classification requirements of SORA (see Correction Law § 168-a [3] [a], 168-d [1] [a], 168-l [6]).  In anticipation of his 2017 release from incarceration, the Board of Examiners of Sex Offenders (the Board) prepared a Case Summary and Risk Assessment Instrument (RAI) recommending that defendant be classified as a level two (moderate risk) sex offender.  On the date initially scheduled for the SORA classification hearing, defendant's new attorney requested and was granted an adjournment to familiarize herself with the case.  Because he was due to be released imminently, the court gave defendant a provisional level two designation "without prejudice to reconsideration," on consent of the parties.

At the next hearing date, counsel informed the court that defendant had been transferred and confined to an OMH facility for treatment pursuant to Mental Hygiene Law article 9.  His mental state was unstable and deteriorating such that OMH staff did not feel "comfortable" transporting him to court.  Based on conversations with her client and OMH

---

[1] In July 2012, defendant was found fit to proceed and was arraigned.  But in April 2013, he was again declared unfit and criminal proceedings paused.  Subsequent competency examinations conducted in November 2013, November 2014, and April 2016 reaffirmed his unfitness.

staff, counsel expressed concern that defendant would not be able to understand the nature of the SORA classification hearing or the requirements of the Act. Relying on the language of SORA, counsel argued that the hearing should be adjourned until defendant's release into the community. Alternatively, counsel argued that "[a]lthough [defendant] doesn't have a full set of due process rights at [a SORA classification] hearing, he does have some due process rights," and therefore asked the court to order a competency examination before proceeding with classification. The court briefly adjourned the hearing without deciding these issues.

At the next hearing date, defendant was unable to appear due to a conflicting court appearance relating to his article 9 confinement. Although Supreme Court expressed its view that a competency hearing was not required to proceed with SORA risk-level classification, it granted another adjournment to give defendant an opportunity to attend in person.

The risk assessment hearing finally took place in October 2017. Defendant was physically present, but his attorney maintained that he was unable to understand the nature of the proceedings, the RAI, or his obligations under SORA, and reiterated her request for a competency hearing. Counsel further argued that it was premature to conduct the hearing because defendant was still confined to an OMH facility and would not be released into the community for an indefinite period of time. Citing *People v Parris* (153 AD3d 68 [2d Dept 2017], *lv denied* 30 NY3d 904 [2017]), the court rejected defense counsel's argument that due process requires a competency examination prior to a SORA classification hearing. The court then proceeded with the hearing and formally adjudicated defendant a level two

sex offender.  The Appellate Division unanimously affirmed (*see* 210 AD3d 595 [1st Dept 2022]).  Defendant appeals to this Court as of right based on the existence of a substantial constitutional question (*see* 39 NY3d 1103 [2023]; CPLR 5601 [b] [1]).

II.

The fundamental principle at the core of the Constitution's due process guarantee "is that when the State seeks to take life, liberty or property from an individual, the State must provide effective procedures that guard against an erroneous deprivation" (*People v David W.*, 95 NY2d 130, 136 [2000]; *see* US Const, Amend XIV, § 1).  "The bedrock of due process is notice and opportunity to be heard" (*David W.*, 95 NY2d at 138).  However, the United States Supreme Court has made clear that due process is a flexible requirement, cautioning that "not all situations calling for procedural safeguards call for the same kind of procedure" (*Morrissey v Brewer*, 408 US 471, 481 [1972]; *see also Medina v California*, 505 US 437, 453 [1992]).

This Court has recognized that SORA classification proceedings are civil and not punitive in nature.  Thus, although the State must provide "more than mere summary process" at a classification hearing, the safeguards required "are not as extensive as those required in a plenary criminal or civil trial" (*People v Baxin*, 26 NY3d 6, 10 [2015] [internal quotation marks omitted]).  Determination of whether a particular safeguard must be provided requires consideration of three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of the additional or substitute procedural safeguard; and (3) the government's interest, including the function involved and the fiscal

and administrative burdens that the additional or substitute procedural requirement would entail (*Mathews v Eldridge,* 424 US 319, 334-335 [1976]; *David W.*, 95 NY2d at 136-137).

We begin, then, with consideration of the private interest at stake. This Court has recognized that SORA registrants have a substantial interest in not being stigmatized by classifications that overstate their danger to the community (*David W.*, 95 NY2d at 137; *see also People v Knox*, 12 NY3d 60, 66-67 [2009]; *Doe v Pataki*, 3 F Supp 2d 456, 469 [SD NY 1998]). "More than 'name calling by public officials,' [a SORA risk level] 'is a determination of status' that can have a considerable adverse impact on an individual's ability to live in a community and obtain or maintain employment" (*see David W.*, 95 NY2d at 137, quoting *Paul v Davis*, 424 US 693, 703 [1976]). Specifically, when a registrant is classified as a level two (moderate risk) or level three (high risk) sex offender, they must register for life, and information about the registrant appears in a public internet directory (Correction Law §§ 168-b [6], 168-l [6] [b]-[c], 168-q). Classification as a level three sex offender also subjects a registrant to more periodic verification requirements (*see id.* § 168-b [1] [b]), and to the residency restrictions of the Sexual Assault Reform Act (SARA) (Executive Law § 259-c [14]; *see People ex rel. Rivera v Superintendent, Woodbourne Corr. Facility*, 40 NY3d 307, 311 [2023]).

Thus, SORA risk-level classification implicates a private liberty interest and triggers due process safeguards (*see David W.*, 95 NY2d at 138). Nonetheless, this liberty interest does not rise to the level of a fundamental right or trigger a requirement that the State shield a sex offender from the social stigma flowing from their criminal conviction or an accurate assessment of their risk to the community (*see Vega v Lantz*, 596 F3d 77, 82 [2d Cir 2010];

*Knox*, 12 NY3d at 67). For that reason, although the liberty interest at stake here is not to be discounted, it is more limited than the interest threatened by a criminal proceeding, where an innocent person may be inaccurately branded a criminal and subjected not only to unjust stigma but the complete curtailment of liberty through a prison sentence.

The second factor to consider is the risk of an erroneous deprivation of the private liberty interest as a result of the procedures used, and the probable value, if any, of additional or substitute procedural safeguards (*David W.*, 95 NY2d at 136, citing *Mathews*, 424 US at 335). Although SORA classification is a civil rather than criminal undertaking, courts have required and this State has long provided a panoply of safeguards aimed at protecting registrants from erroneous SORA classifications (*see Doe v Pataki*, 3 F Supp 2d at 471-472; *see also* Sponsor's Memorandum, Bill Jacket, L 1999, ch 453 at 4 [amending SORA to cure the due process deficiencies identified in *Pataki*]). SORA risk levels are based on factors developed and applied in the first instance by an agency practiced in evaluating such matters (the Board), and then tested at an adversarial hearing before a judge (Correction Law §§ 168-l [5]-[6], 168-n [2]); the registrant is entitled to an attorney at the hearing, including one appointed by the court if the registrant is unable to afford an attorney of their own choosing (*id.* § 168-n [3]); the registrant and counsel must be provided advance notice of the hearing, the Board's recommendation, its bases, and any contrary assessment by the People sufficiently in advance to allow a meaningful opportunity to prepare a defense (*id.* § 168-n [2]-[3]); the registrant is entitled to pre-hearing discovery of material relied upon by the Board in making its recommendation (*id.* § 168-n [3]); the People must prove, by clear and convincing evidence, that the assigned classification is warranted (*id.*);

the registrant must have the opportunity to appeal the classification (*id.*); and the registrant can seek modification of their risk level once per year—with a right to counsel at the modification hearing—for as long as they remain registered (*id.* § 168-o; *see generally Pataki*, 3 F Supp 2d at 471-472; *David W.*, 95 NY2d at 133; *Baxin*, 26 NY3d at 10-11; *People v Lashway*, 25 NY3d 478, 483-484 [2015]).

Defendant argues that his incompetency prevented him from taking full advantage of these protections, from being truly "present" at the hearing, and from assisting his counsel in preparing a defense. He therefore asks us to supplement the SORA procedures by requiring a competency examination when it appears that a registrant may lack capacity to understand the risk-level assessment proceeding. In addition, he "suggests that, upon a finding of incompetency, the SORA hearing and appropriate risk level designation would either be foreclosed or postponed indefinitely" (*see Parris*, 153 AD3d at 78).

Defendant has not demonstrated that his proposed safeguard—which amounts to exempting incompetent registrants from SORA classification for the duration of their disability—would meaningfully reduce inaccurate risk-level classifications, even if the robust existing procedures leave gaps through which a rare incompetent registrant might fall. If anything, defendant's proposal seems certain to create inaccuracy, especially with respect to registrants who meet the criteria for heightened risk levels. It would result in every incompetent registrant, including those who could justly be adjudicated level three (high risk) offenders, being treated more favorably than a level one (low risk) offender

regardless of the particular circumstances or risk to the public[2] (*see Doe v Sex Offender Registry Bd.*, 81 Mass App Ct 610, 616 [2012] [hereafter *Doe (Massachusetts)*] ["due process does not entitle (incompetent) offenders to greater protection than that afforded their competent counterparts"]).

In contrast, it is far from inevitable that incompetent registrants will be misclassified when courts follow the ordinary procedures, particularly given a registrant's right to counsel and the People's heightened burden of proof at a classification hearing. Here, no showing was made that postponing defendant's classification would have resulted in him being adjudicated a level one offender, rendering the value of the proposed additional safeguard conjectural rather than "probable" (*see Mathews*, 424 US at 343).[3] And even admitting the possibility of an initial misclassification, defendant can still seek modification of his risk level on an annual basis (*see Parris*, 153 AD3d at 82). This being

---

[2] The dissent suggests that exempting incompetent registrants from SORA classification would treat them no differently than persons who "move[] to New York from a different jurisdiction or [are] released from federal custody, or when for some other reason a court is unable to hold a hearing prior to the offender's release" (dissenting op at 22-23). The classes of offenders the dissent is referencing are required to be given risk levels "expeditiously" (Correction Law § 168-l [8]). SORA does not permit the type of avoidable and indefinite delay in risk-level classification the dissent and defendant are advocating for here.

[3] Defendant was represented by counsel who diligently defended his interests. Among other things, counsel successfully argued against the Board's assessment of points based on defendant's purported failure to accept responsibility at his parole intake interview, because there was "no evidence whether [he] was fully competent or fit" at the time of his alleged denial of guilt. Counsel also made creditable arguments in support of a request for a downward modification from level two based on defendant's age and mental health issues, with supporting literature. Defendant does not seek our review of the court's discretionary determination to deny a downward departure based on those factors.

the case, defendant simply has not shown that exempting incompetent registrants from SORA classification for indefinite periods is necessary or likely to make this civil process meaningfully more reliable or accurate (*see Doe [Massachusetts]*, 81 Mass App Ct at 615 [concluding that "(t)he robust, adversary character of the classification process minimizes the risk of … erroneous classification," even when a defendant is incompetent]).

The final *Mathews* factor requires us to consider "the public interest" and the administrative and societal costs associated with the additional proposed safeguard (*Mathews*, 424 US at 347; *see David W.*, 95 NY2d at 136-137). Obviously, conducting a psychiatric examination and additional hearing to determine a registrant's mental competency would impose additional burdens on the government, as would the task of continually monitoring registrants found to be incompetent over indefinite periods to determine whether they have regained fitness and can be accurately classified. In this case, it took over five years and seven competency examinations before defendant was found competent to stand trial, a timeframe that could have been extended even further had he elected not to plead guilty.

Beyond the financial and administrative costs, the State also has a "compelling interest" in protecting its citizens by promptly notifying the public of registrants who pose a heightened threat of recidivism (*see Pataki*, 3 F Supp 2d at 470). Delaying the classification of incompetent registrants threatens that interest, in that it risks that some dangerous registrants will be released into the community for lengthy periods without accurate risk-level designations or public notice. Defendant and the dissent dispute this point, noting that offenders must still register with the Division of Criminal Justice Services

at least 10 days prior to their release (*see* dissenting op at 11-12); however, risk-level classification determines the scope of information available to the public upon registration. Because the online sex offender database lists only level two and level three offenders (Correction Law § 168-q), members of the public who search the database will not be informed of a registrant without a risk level, regardless of the actual risk they pose.[4]

The dissent asserts that the State's interest in protecting the public is not advanced by classifying offenders while they are in OMH custody under MHL article 9. However, defendant has never limited his due process argument to his specific situation. Rather, defendant argues that it is unconstitutional to classify *any* incompetent registrant during the period of their disability. As *Mathews* itself holds, "procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions" (424 US at 344). The dissent is also selective in its analysis of the effects of MHL article 9 confinement. Just as article 9 confinement shields the public from offenders, it also shields offenders from the public and its stigma, which cannot in this context impact any offender's "ability to live in a community and obtain or maintain employment" (*David W.*, 95 NY2d at 137). Further, although it is possible that an offender may be denied placement at a particular residential treatment facility, such as

---

[4] The dissent also references a telephone number the public can call, but only limited information is available to the public through that method. Calling the number allows a person to "inquire whether a named individual required to register pursuant to [SORA] is listed," if the caller can supply the individual's "exact street address, including apartment number, driver's license number or birth date, along with additional information that may include social security number, hair color, eye color, height, weight, distinctive markings, ethnicity[,] or … any combination of the above listed characteristics if an exact birth date or address is not available" (Correction Law § 168-p).

a nursing home, as a result of their risk level (dissenting op at 24), this merely reinforces that an offender's risk level is useful in determining which custodial settings are suitable, and to avoid placing a potentially dangerous offender in an inappropriate facility.

In the end, although the consequences of misclassification to registrants when they reenter society are "sufficiently serious to warrant more than mere summary process," the State nevertheless maintains a compelling interest in an "expedited" process "without the burden of a new adversary criminal trial" and its greater concomitant due process protections (*see Pataki*, 3 F Supp 2d at 470 [internal quotation marks omitted]). As we have further recognized, " 'the Due Process Clause simply does not mandate that all governmental decision-making comply with standards that assure perfect, error-free determinations' " (*Pringe v Wolfe*, 88 NY2d 426, 434 [1996], quoting *Mackey v Montrym*, 443 US 1, 13 [1979]). What is required is a process that reasonably balances the competing interests at stake (*see Tulsa Professional Collection Servs., Inc. v Pope*, 485 US 478, 484 [1988] ["The focus is on the reasonableness of the balance"]). Balancing the *Mathews* factors, we agree with the weight of authority that the State's substantial interest in efficiently assessing registrants' risk to the community outweighs that of incompetent registrants to a delay of SORA classification during an indefinite period of disability (*see Parris*, 153 AD3d at 78, 80-81; *accord State v Khan*, 2017-Ohio-4067, ¶ 17 [Ohio Ct Apps 2017]; *Doe [Massachusetts]*, 81 Mass App Ct at 615-616).

Our conclusion that incompetency does not preclude SORA classification is fully consistent with jurisprudence in analogous contexts. In *Matter of Lopez v Evans*, this Court held that due process requires that a parolee be competent before the Division of Parole

can adjudicate an alleged violation of the terms and conditions of their release (25 NY3d 199 [2015]). But as the Appellate Division recognized, there are significant distinguishing factors between parole revocation proceedings and SORA classification hearings. Most notably, parole revocation proceedings are punitive in nature and their purpose is to adjudicate wrongdoing, the consequence of which may be a defendant's re-incarceration (*Parris*, 153 AD3d at 78-79; *see Lopez*, 25 NY3d at 206 ["Clearly salient are constitutional concerns about the fundamental fairness of a proceeding in which a defendant who is unable to make decisions about his defense may be returned to prison"]). In contrast, SORA classification hearings are not intended to serve as a form of punishment, and incarceration is not a potential consequence of SORA classification in and of itself. That restriction of liberty can occur only if a registrant later violates the rules applicable to their classification, at which point additional procedures must be followed before the registrant may be penalized by incarceration.[5]

The People more aptly analogize this situation to the multitude of civil proceedings in which comparatively greater private interests are threatened, but which under current law may proceed notwithstanding questions regarding a party's competency. These

---

[5] Specifically, a registrant who fails to register or verify in the manner and within the time periods provided for under SORA may be prosecuted for committing a class E felony (*see* Correction Law § 168-t). Although we have no occasion here to decide the culpable mental state required for the crime of failure to register, we note that the Criminal Jury Instructions provide that, to be guilty, "a sex offender must know that he or she is required to register and must know the manner and time periods within which he or she is required to do so" (CJI2d [NY] Correction Law § 168-t; *see People v Haddock*, 48 AD3d 969, 970-971 [3d Dept 2008], *lv dismissed* 48 AD3d 969 [2009]; Gary Muldoon, Handling a Criminal Case in New York § 23:91 [2023]).

include civil commitment proceedings under the Sex Offender Management and Treatment Act (SOMTA) (*see e.g.*, *Matter of State of NY v Daniel Oo.*, 88 AD3d 212 [3d Dept 2011], *lv denied* 21 NY3d 1038 [2013]; *United States v Comstock*, 627 F3d 513 [4th Cir 2010], *cert denied* 564 US 1030 [2011]; *Matter of Care & Treatment of Oxner*, 440 SC 5 [2023]; *Matter of Det. of Morgan*, 180 Wash2d 312 [2014]; *Moore v Superior Ct.*, 50 Cal4th 802 [2010]; *Commonwealth v Burgess*, 450 Mass 366 [2008]; *People v Weekly*, 956 NE2d 634 [Ill App Ct 2011], *appeal denied* 357 Ill Dec 293 [2012]; *State ex rel. Nixon v Kinder*, 129 SW3d 5 [Mo Ct App 2003], *cert denied* 543 US 979 [2004]), federal immigration removal proceedings (*Munoz-Monsalve v Mukasey*, 551 F3d 1 [1st Cir 2008]; *Brue v Gonzales*, 464 F3d 1227, 1232-1233 [10th Cir 2006]; *Nee Hao Wong v Immigr. & Naturalization Serv.*, 550 F2d 521 [9th Cir 1977]), and termination of parental rights proceedings (*Matter of Joyce T.*, 65 NY2d 39, 50 [1985]).  In addition, the Appellate Division has held that an order of protection can be issued against an incompetent respondent in a family offense proceeding (*see Julie G. v Yu-Jen G.*, 81 AD3d 1079, 1081 [3d Dept 2011]).  Under defendant's and the dissent's logic, incompetency would prevent the State from issuing such orders for the protection of domestic violence victims because they "place[ the respondent] in jeopardy of criminal prosecution" in the event the respondent proceeds to contact (or harm) the subjects of the protective order (*see* dissenting op at 13).  Due process has not been held to require competency determinations in these types of proceedings— even though they can result in civil confinement, deportation, the severing of family relationships, and the threat of future prosecution—and it therefore follows that due process is not offended by the failure to hold a competency hearing before determining which of

three risk-level classifications should be assigned to a convicted sex offender (*see Parris*, 153 AD3d at 80).

The dissent's broader assertion that there is "no need to balance interests" under *Mathews* because the "courts and the legislature have already struck a balance favoring" a competency requirement (dissenting op at 9) finds no support in statute or caselaw. We cannot "presume" that the legislature contemplated a CPL article 730 equivalent for SORA through silence, or through the provision of basic procedural safeguards like notice, counsel, and a hearing held on a specific timeline prior to a registrant's release (*see id.* at 7). The decision to foreclose the classification of incompetent registrants during the period of their disability would create very real administrative burdens and public safety risks which do not exist under the current scheme and which must be weighed against the conjectured additional benefit to incompetent registrants.[6] Our decision today respects the need for flexibility and limiting principles outside the criminal context to facilitate the government's ability to protect the citizens of this State whose interests may come into conflict with those of incompetent registrants. Balance and pragmatism are not antithetical to fundamental fairness; rather, they are essential to the administration of justice and demanded by the Constitution (*see Lassiter v Department of Social Servs.*, 452 US 18, 24-

---

[6] For precisely the same reason, we cannot avoid *Mathews* and circumvent consideration of a registrant's liberty interest simply by "presuming" that prior courts and the legislature weighed the interests involved and decided *against* a competency requirement, which after all appears nowhere in SORA, its legislative history, or this Court's precedents. As the dissent acknowledges, "this Court has no authority to replace its preferred policy for that of the legislature" (dissenting op at 12 n3, citing *People v Davis*, 43 NY2d 17, 30 [1977]).

25 [1981] [instructing that "what 'fundamental fairness' consists of in a particular situation" cannot be determined without "assessing the several interests that are at stake"]; *see Morrissey*, 408 US at 481 ["To say that the concept of due process is flexible does not mean that judges are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure'"]).

For these reasons, we reject the argument that defendant's due process rights were violated when Supreme Court declined to order a competency hearing before adjudicating him a level two sex offender.

III.

Defendant's counsel also argued below that the classification hearing was premature under SORA itself, and should not have been held while defendant remained civilly committed to an OMH psychiatric facility pursuant to MHL article 9. More particularly, counsel argued that "the SORA Act itself says that the SORA hearing should be held before someone is released," and that the most sensible reading of that requirement is that the hearing must occur "at the time [the registrant] is actually being released into the community," not merely upon release from incarceration. We disagree.

SORA's plain text and structure authorize risk-level determinations "[30] calendar days prior" to a registrant's release from incarceration following the completion of their prison sentence, regardless of pending civil commitment proceedings (*see* Correction Law § 168-n [2]). The statute does not require courts to indefinitely postpone SORA classification until a registrant's release from civil confinement, and doing so would inject

a degree of uncertainty into the classification process not contemplated or intended by the legislature. Unlike a registrant's release from incarceration, a registrant's release from civil confinement does not typically occur on a date scheduled far in advance: it is premised on changing conditions and can occur abruptly or on short notice (*see e.g.* MHL §§ 9.33, 9.35). Given that unpredictability, defendant has not shown that it would be possible for the Board, district attorneys' offices, and courts to reliably comply with the carefully developed SORA classification process—instituted to protect both the public and registrants' due process rights—if the various deadlines and milestones in that process were to be measured from release from civil confinement.

Accordingly, the order of the Appellate Division should be affirmed, without costs.

RIVERA, J. (dissenting):

It is a matter of fundamental fairness and due process that a person called to appear before a court where their liberty is at stake should have the mental capacity to understand the nature of the proceedings, consult with counsel, and assist in their defense. A defendant's competency is also a prerequisite to the constitutional and statutory due

- 1 -

process safeguards that expressly apply to Sex Offender Registration Act (SORA) risk classification proceedings.

Defendant has a mental disability. He is also a convicted sex offender who for most of his prosecution was found unfit to stand trial. After his release and during his SORA risk classification hearing defendant was confined to a psychiatric facility. His counsel requested a competency hearing to determine whether defendant understood the nature and consequences of the SORA proceedings and was capable of assisting with his defense. No one disputes that this request was well founded given defendant's chronic mental illness, history of unfitness to stand trial, immediate commitment upon completion of his sentence, and disorganized and illogical communications with counsel. Nor does anyone dispute that defendant has a protected liberty interest that entitled him to a hearing adequate to guard against the risk of an erroneous risk classification, as due process requires. I cannot agree with the majority that the SORA hearing held with defendant's competency in doubt satisfies due process. If he could not understand the proceedings, could not lucidly communicate with his counsel in preparing arguments to the court, and lacked the ability to understand the consequences of the court's judgment, the hearing was a mockery. We are a society of laws and those laws protect the mentally disabled. I dissent from the majority's endorsement of this injustice.

I.

Defendant Darryl Watts is mentally disabled. His illness dates back over 50 years. The majority acknowledges that defendant "suffers from severe schizophrenia and psychosis," and at the time of his offense, "was responding to internal voices" and believed that "the victim was chosen for him" (majority op at 2). During the six-year pendency of his criminal prosecution, he was found mentally unfit to stand trial five times. His CPL Article 730 examiners reported that he was "actively psychotic" such that he had no "rational or factual understanding of the roles of courtroom personnel or legal proceedings," did not recognize his lawyer, and was "unable to discuss his case in a rational manner." At one point, he expressed belief that the victim had been stalking him and that his lawyer was working for "both sides." In 2013, defendant was admitted to Mid-Hudson Forensic Psychiatric Center for treatment.

After he was deemed competent at his seventh examination in December 2016, defendant pleaded guilty to first-degree sexual abuse (Penal Law § 130.65 [1]) and second-degree assault (Penal Law § 120.05 [12]), automatically subjecting him to SORA registration requirements. The court sentenced him to six years in prison and ten years of post-release supervision. Due to the length of time he had already spent in custody during his periods of incompetence, his release was set for July 2017. In preparation for that release date, the Board of Examiners of Sex Offenders (Board) recommended that defendant be adjudicated a level 2 (moderate risk) offender under SORA. However, in August 2017, shortly after his anticipated release date, defendant was transferred from

DOCCS custody to involuntary confinement at South Beach Psychiatric Center—an Office of Mental Health (OMH) facility—pursuant to Mental Hygiene Law (MHL) Article 9.[1]

Prior to defendant's release and psychiatric confinement, the same judge that presided over defendant's several incompetency determinations, plea, and sentence adjourned the SORA hearing to a future date but provisionally designated defendant a level 2 risk "without prejudice" pending a final determination. Thereafter, defendant's counselor from the psychiatric center notified defense counsel that defendant "had a vastly different mental state presentation than the week before," and that the facility did not "feel comfortable or think it was appropriate to transport him with their staff." The counselor described defendant as "having very disorganized thinking, mood fluctuations, [and] unpredictable and [ ] degenerative tendencies." The staff, in fact, did not transfer defendant to his rescheduled SORA hearing, but counsel appeared and informed the court of the staff's decision to hold defendant.

Counsel also expressed her "grave concerns" that defendant was not competent to understand his SORA hearing or its consequences. She explained that during her attempts to engage defendant, "his spe[ech] is illogical. It is disorganized. He doesn't follow a fluid narrative so it is very difficult for me to follow what he is telling me as well as for me to comprehend whether he understands what I am saying." Counsel further argued that SORA required the court to hold the hearing closer in time to defendant's release into the

---

[1] Under Article 9, a person with a mental illness may be involuntarily committed for care and treatment essential to their welfare when their "judgment is so impaired that [they are] unable to understand the need for such care and treatment" (MHL § 9.01)

community, and that holding the hearing while defendant was incompetent would violate his due process rights. The prosecution consented to an adjournment, and the court adjourned the case to consider defense counsel's arguments and to see if defendant's mental condition would improve.

Thirty days later, at the next court date, defendant was unavailable because he was appearing in Mental Hygiene Court the same morning. Defense counsel confirmed to the court that the psychiatric center was seeking to retain defendant, and again moved for a competency hearing. The court denied the motion, concluding that it was authorized to move forward with the SORA hearing without a competency determination, but granted another adjournment since defendant was only absent because of a conflicting court date.

The parties reconvened a few weeks later with defendant in attendance. Defense counsel stated her continued belief that defendant was not able to understand the nature of the proceedings and again argued that the hearing should be adjourned until closer in time to defendant's release from psychiatric confinement. The court proceeded with the hearing over counsel's objection, leaving counsel to present her arguments in support of a downward departure without defendant's assistance. Counsel focused on the difficulties defendant would have finding housing as a level 2 offender and his lack of any prior violent criminal history. She also submitted studies showing that mental illness is not a reliable predictor of recidivism and that offenders above the age of 50 reoffend at a lower rate.

Counsel supported her arguments with evidence from the existing record and outside expert sources, not on communications with or input from defendant.

In its written decision adjudicating defendant a level 2 sexually violent offender, the court acknowledged counsel's representations that defendant was committed to a secure psychiatric facility at the time of the hearing, and that in the eight months between defendant's sentencing and the hearing, "defendant was described as having 'decompensated' and according to counsel was traveling on a downward spiral into another bout of mental illness." Based on its own observations, the court found that during the hearing defendant "sat at counsel table with a vacant stare and did not appear to have said a word to his lawyers." The court further acknowledged that defendant was being held at a psychiatric facility pursuant to a civil commitment order for at least another four months. On the merits, the court found defendant was properly assessed 90 points, placing him in the level 2 risk category. The court rejected defendant's request for a downward departure, in part, because it did "not know [defendant's] current mental state, [and] it hardly seems possible we can predict his future psychiatric condition and how it might impact his likelihood of offending."

## II.

Defendant argues that competency is a fundamental right at a SORA classification hearing because an incompetent registrant is unable to meaningfully exercise the rights and procedural protections afforded them under the statute. Defendant also contends that his

classification hearing was held prematurely because it was held long before he was set to be released into the community. The prosecution responds that SORA's list of procedural requirements is exhaustive and does not include a right to a competency hearing, and that the statute plainly mandates a hearing upon release from a correctional facility.

Contrary to the majority's conclusion, SORA's procedural safeguards presume the offender's competence to understand the nature and consequences of the hearing and meaningfully participate in and assist with his defense. The question before us does not require a rebalancing of defendant's interests against those of the State. Instead, the analysis here is controlled by prior case law recognizing an offender's right to due process, SORA's codification of judicially-identified procedural requirements, and the fundamental tenet of fairness at the core of any due process analysis.

We have previously recognized, as have federal courts, an offender's liberty interest in "not being required to register under an incorrect label" (*People v Knox*, 12 NY3d 60, 66 [2009], citing *Paul v Davis*, 424 US 693, 701-710 & n 5 [1976]; *People v David W.*, 95 NY2d 130, 137 [2000]; *People v Gillotti*, 23 NY3d 841, 863 [2014]).  As we reaffirmed in *People v Brown*, an offender has a "liberty interest in a criminal designation that rationally fits [their] conduct and public safety risk" (-- NE3d -- , 2023 WL 8039655, at *6 [2023]). The protections afforded an offender in a SORA risk classification proceeding were recognized in the *Doe v Pataki* federal litigation, wherein the courts held offenders have a right to constitutional due process and invalidated the prior framework that lacked those safeguards (3 F Supp 2d 456 [SD NY 1998], *on remand from* 120 F3d 1263 [2d Cir 1997]).

The federal district court observed that risk level classification hearings fall "somewhere between a criminal proceeding . . . and a simple administrative hearing," and that, although the due process protections required for these proceedings "are not as extensive" as those required in a criminal trial, registrants are entitled to, at a minimum: a hearing; notice of the hearing which explains the proceeding's purpose and discloses the Board's recommendation; counsel; pre-hearing discovery of evidence that informed the Board's recommendation; a requirement that the State prove the facts supporting each risk factor by clear and convincing evidence; and the right to appeal the determination (3 F Supp 2d at 470-472).

To comply with the federal court's order, the legislature codified these procedural safeguards by amending SORA (*see* Letter of Legislative Bureau Chief, Bill Jacket, L 1999, ch 453 at 6 [explaining that the changes to Correction Law § 168-n respond to the concerns set forth in *Doe*]). SORA thus provides that a court shall make a risk level determination prior to a sex offender's "discharge, parole, release to post-release supervision or release [] by the sentencing court" (Correction Law § 168-n [1]; *People v Boone*, -- NY3d --, [2024] [reading this language to mean release from DOCCS custody]). The court shall also make a determination on the level of notification after receiving a recommendation from the Board (*id*. § 168-n [2]). In advance of the risk assessment, a sex offender is entitled to counsel, notice of the SORA hearing date, a copy of the Board's risk level recommendation to the court with the Board's reasons, notice that the purpose of the hearing is to determine the offender's risk level (1, 2 or 3) and the registration requirements

(*id*. § 168-n [3]). The notice must also advise the offender that "[f]ailure to appear may result in a longer period of registration or a higher level of community notification because you are not present to offer evidence or contest evidence offered by the district attorney" (*id*.). The notice must also advise the offender that they have a right to a hearing and to be represented by counsel—and, if the offender is eligible, one will be appointed—and the right to the prosecution's statement with its proposed determinations and reasons therefore (*id*.). The offender has a right to discovery and present evidence on their behalf, including witnesses and documentary materials, as well as the right to testify in support of their arguments and downward departure request, if any (*id*.). The prosecutor bears the burden to establish by clear and convincing evidence the facts supporting its recommendation (*id*.). The court must set forth its written factual findings and conclusions of law supporting its risk level determination (*id*.).

The majority plows unnecessarily through a thicket of legal issues that are irrelevant because an offender's liberty interest and their constitutional right to due process in a risk classification proceeding are constitutionally and statutorily established. There is simply no need to balance interests under *Mathews v Eldridge* (424 US 319 [1976]) because the courts and the legislature have already struck a balance favoring offenders' rights to procedural safeguards.

The question is not whether defendant is entitled to a competency hearing prior to his risk classification as some additional form of due process, but whether it violates an offender's extant due process rights to conduct a risk level assessment hearing when they

are not competent to participate in the proceeding or their competence is in question. Put another way, the question is whether an offender must be competent for the procedural safeguards to be meaningful. The answer is so obvious it hardly bears discussion and yet the majority ignores first principles and concludes that a competency requirement is unnecessary because the procedural safeguards are sufficient without consideration of the offender's mental capacity. That analysis is fatally flawed because it fails to recognize that the existing safeguards presume the offender's competence to invoke their protections.

As a matter of fundamental fairness and common sense, this panoply of due process guarantees acquires significance only when the offender is competent to participate in the hearing.[2] Notice is meaningless unless the offender understands its contents. The right to counsel is meaningless if the offender cannot communicate lucidly with their legal representative. Indeed, as appellate counsel argues on this appeal, an offender is denied effective representation by counsel if due to their mental disability they are unable to engage counsel and provide information to assist in their defense. The right to be present and participate is illusory if an offender attends court physically without the mental

---

[2] The importance of a defendant's competence throughout the legal proceedings against them has been recognized since the mid-18th century. Blackstone's Commentaries discussed an earlier law in place during the reign of Henry VIII which said that a person who commits a crime while "being compos mentis" and then later "fall[s] into madness" may "be tried in [their] absence" and even "suffer death, as if [they] were of perfect memory." Blackstone called this law "savage and inhuman," and observed that, even for an individual who commits a crime while sane, they "ought not to be arraigned for it" if they are not competent "to plead to it with that advice and caution that [they] ought," and should not be tried if they cannot "make [their] defense" (4 William Blackstone, Commentaries on the Laws of England at 24-25). The critical observation holds true in the SORA context: an incompetent individual cannot defend themselves.

capacity to understand and participate in the proceedings. And an offender's rights to controvert the prosecution's evidence and recommended risk level classification, to challenge an upward departure request and argue in support of a downward departure are made a mockery if the offender is mentally unable to articulate their thoughts, express remorse to the court, or explain why they present a lower risk of offense than the Board and the prosecution contend.

Nor does this inherent competency requirement undermine "the purpose underlying SORA—to protect the public from sex offenders" (*People v Mingo*, 12 NY3d 563, 574 [2009]). Under SORA, an offender must register with the Division of Criminal Justice Services "at least ten calendar days prior to discharge, parole, release to post-release supervision or release from any state or local correctional facility, hospital or institution where [they were] confined or committed" or "at the time the sentence is imposed for any sex offender released on probation or discharged upon payment of a fine, conditional discharge or unconditional discharge" (Correction Law § 168-f [1]). The legislature ensured with this pre-risk classification mandate that there would be no lapse in registration during any potential delay between an offender's release from custody and the court's risk classification determination. In other words, an offender will not "slip through the cracks" if they were released into the community without having been designated a SORA risk level. The risk level classification sets the community notification level that applies to an already-registered offender. Level 1 offenders and those who have not yet received a risk level classification must register annually for twenty years from the date of their

registration, while level 2 and 3 offenders must register annually for life (*id*. § 168-h [1-2]). Level 3 offenders must also verify their address every ninety calendar days with local law enforcement (*id*. § 168-h [3]). All registered offenders—classified or not—are listed in a telephone database available to the public (*id*. § 168-p [1]), while level 2 and 3 offenders also appear in the online database which makes public the offender's name, address, place of employment, photo, crimes of conviction, and other identifying information (*id*. § 168-q [1]).[3] Thus, there is no lapse in law enforcement notification and the public has a mechanism for learning certain information about an offender even without a risk level classification. Of course, persons like defendant, whose mental disability renders them incompetent to participate in a SORA hearing may very well not be released into the community for some time. As of this appeal, defendant is still confined in a psychiatric facility. He poses no danger to the public.

III.

---

[3] The majority asserts that incompetent, unclassified offenders would not be listed on the online sex offender database, and that the telephone hotline would only disclose the offender's presence on the registry to callers who can supply certain identifying information about the offender (majority op at 13 & n 4). This distinction matters little with respect to offenders who, like defendant, are civilly committed to a secure treatment facility and therefore pose no danger to the public. Moreover, this pre-classification registration applies to *all* offenders until the time that their risk level can be correctly classified, after a hearing in which they are able to participate. To the extent the majority believes it to be inadequate, this Court has no authority to replace its preferred policy for that of the legislature (*see People v Davis*, 43 NY2d 17, 30 [1977]).

Even under the majority's unnecessary analysis, the *Mathews v Eldridge* balancing test leads to the same conclusion: an offender's competency at the risk classification hearing is an indispensable requirement of the process due (*see* 424 US at 335). Indeed, contrary to the majority's view, all three *Mathews* factors tip in favor of a competency requirement.

As to the first factor, the majority acknowledges an offender's liberty interest in an accurate risk classification but concludes that the interest is limited based on the civil nature of SORA registration and risk classification proceedings (majority op at 6). Only by constricting the lens through which it views this interest can the majority reach such a conclusion. Offenders who are not competent or whose competence is in doubt have an additional interest at stake because they are at greater risk of failing to comply with SORA due to their mental disability. Failure to comply with SORA registration requirements— and for offenders subject to SARA, the additional requirements that flow from a level 2 or 3 designation—places an offender in jeopardy of criminal prosecution, with an attendant loss of liberty. Reporting requirements differ by risk level. For example, level 1 and 2 offenders must report in person for a current photograph every three years, while level 3 offenders must appear every year. Level 3 offenders designated as a sexual predator must also verify their address every 90 days. An incompetent registrant who cannot understand the nature of the proceeding—particularly ones who, like defendant here, have a long history of mental illness—may be incapable of complying with these heightened requirements year after year. As one Ohio court queried, how could "an individual in the

throes of Alzheimer's disease . . . functionally be able to comply with the annual registration requirements[?]" (*State v Chambers*, 783 NE2d 965, 969, 151 Ohio App 3d 243, 248 [Ohio Ct App 2002]). Of course, noncompliance puts the individual at risk of incarceration. Failure to register or verify is a class E felony for a first offense and a class D felony for a second or subsequent offense, and may also be a basis for parole revocation (Correction Law § 168-t). Further, a level 3 designation subjects an offender to the residency restrictions of SARA (Executive Law § 259-c [14]). Level 2 and 3 offenders are ineligible for certain housing, including with the New York City Housing Authority, making it significantly more difficult to find a suitable, SARA-compliant residence. If the offender is unable to find compliant housing, they may be confined past their conditional or maximum release date.[4] Thus, the outcome of a SORA hearing may directly result in continued incarceration and may indirectly result in re-incarceration should the mentally disabled offender be unable to comply with the heightened reporting requirements of a moderate or high risk designation. The majority fails to account for and accommodate this liberty interest of a mentally incompetent offender.

As to the second factor—the likelihood of an erroneous determination absent the procedure sought by an offender—the majority bootstraps its way to a conclusion that there are already "robust" procedural requirements in a SORA hearing that sufficiently protect

---

[4] This is a significant problem for offenders with additional housing requirements. Disabled offenders, for example, are "held in prison an average of three years past their release date awaiting [SARA]-compliant housing" (Kevin Bliss, *New York's SARA Requirements Force Sex-Offenders into Homelessness Then Hold Them in Prison Due to Their Homelessness*, Criminal Legal News [April 2020]).

against erroneous deprivation of the narrow interest it believes is at stake (majority op at 8). As discussed, the Constitution and SORA guarantee an offender a host of rights (Correction Law §§ 168-n [2]-[3]; 168-o [2]; *Doe*, 3 F Supp 2d at 470-472). The majority fails to recognize that these statutorily codified constitutional rights cannot be exercised by an incompetent defendant.

Indeed, many of these rights are identical to the ones afforded to defendants in parole revocation hearings, which this Court has expressly held cannot be exercised by an incompetent individual (*see Lopez v Evans*, 25 NY3d 199, 206 [2015]). The majority attempts to distinguish *Lopez* on the ground that parole revocation proceedings are "punitive in nature and their primary purpose is to adjudicate wrongdoing, the consequence of which may be a defendant's re-incarceration," compared with SORA risk classification hearings which "are not intended to serve as a form of punishment, and incarceration is not a potential consequence of SORA classification in and of itself" (majority op at 13). This minimizes the interest at stake in SORA hearings. Although the Court has stated that SORA is not a penal statute, there is no question that its "consequences" are "unlimited," and that registration—especially at a higher risk level classification—carries stigma that "pervades into every aspect of an offender's life" (*Doe*, 120 F3d at 1279). Additionally, as discussed with respect to the offender's interest under the first *Mathews* factor, the threat of incarceration is implicated in a SORA classification hearing, particularly for incompetent registrants.

The majority holds that SORA hearings are "more aptly analogize[d]" to civil commitment proceedings under the Sex Offender Management and Treatment Act (SOMTA), which "may proceed notwithstanding questions regarding a party's competency" (majority op at 13). But those proceedings are instituted only where the State believes there is sufficient evidence that the defendant is "a detained sex offender who suffers from a mental abnormality," defined in the statute as "a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person" in a manner that predisposes them to criminal sexual conduct (MHL §§ 10.07, 10.03 [i]). It is self-evident that such proceedings can go forward without a competency determination; they are instituted precisely because the individual has some alleged mental condition or disorder. That mental condition or disorder cannot hinder a SOMTA proceeding when it is the very reason for the proceeding. Moreover, the purposes of SOMTA and SORA hearings are not the same. While a SOMTA hearing is, in part, designed to protect the community, its purpose is also to provide care and treatment to mentally ill sex offenders (MHL § 10.01 [c], [f] ["The goal of a comprehensive system should be to protect the public, reduce recidivism, and ensure offenders have access to proper treatment, and "the system should offer meaningful forms of treatment to sex offenders in all criminal and civil phases, including during incarceration, civil commitment, and outpatient supervision"]). Although a SORA risk classification is civil, its purpose is in no way to assist the offender but solely to set the proper risk level to ensure public safety (*Brown*, 2023 WL 8039655 at *3; *Mingo*, 12 NY3d at 574).

The majority references other types of civil hearings but those comparisons are similarly inapt (*see* majority op at 14). In the immigration context, the federal government has "broad power" to "make[ ] rules that would be unacceptable if applied to citizens" (*Reno v Flores*, 507 US 292, 304 [1993], quoting *Fiallo v Bell*, 430 US 787, 792 [1977]). Thus, the individual's interest is outweighed by federal authority. The termination of parental rights can be effected where a parent is, "by reason of mental illness or intellectual disability, [unable] to provide proper and adequate care" for their child (Social Servs Law § 384-b [4] [c]). Those termination proceedings, like SOMTA proceedings, necessarily involve an incompetent party. It would be impractical and contradictory to create a rule that would require a parent to argue that they are too mentally ill to understand the proceeding but are mentally fit to care for their child. The majority also cites one Appellate Division decision for the proposition that "an order of protection can be issued against an incompetent respondent in a family offense proceeding" (majority op at 14, citing *Julie G. v Yu-Jen G.*, 81 AD3d 1079, 1081 [3d Dept 2011]). *Julie G.* says no such thing. The Appellate Division held that "the competency procedures under CPL article 730, applicable in criminal actions, do not govern in family offense proceedings in Family Court" but nevertheless "[i]n civil proceedings, the court can appoint a guardian ad litem for a party who cannot understand the proceedings, defend [their] rights or assist counsel" (*id.*, citing CPLR 1201). Thus, the Appellate Division recognized what the majority chooses to ignore: the law does not run roughshod over the mentally disabled but instead protects their rights.

Two of the most critical rights that an incompetent offender cannot fully exercise is the right to counsel and the right to be present at the hearing. SORA guarantees the right to counsel, including assigned counsel for eligible offenders. But that right is rendered meaningless unless counsel can communicate with their client because the client "provide[s] the factual underpinnings of the presentation" (*Lopez*, 25 NY3d at 206). An attorney cannot advance their client's interests if the client lacks "sufficient present ability to consult with [their] lawyer with a reasonable degree of rational understanding" (*Dusky v United States*, 362 US 402, 402 [1960]).

Defendant's case illustrates the lawyer's quandary. Defendant gave such a limited personal history that counsel was not even sure what grade level defendant completed in school. There was no way for counsel to seek relevant documentary evidence outside of the record, such as medical records related to defendant's family history of schizophrenia or letters of support from loved ones. Defendant also at one point had suggested his trial attorney was working "on both sides," indicating that, as a result of his mental disability, he might not have trusted counsel enough to disclose personal information to her. Medical records in particular often require a defendant to sign medical release forms that someone who is paranoid as a result of their mental disability may refuse to sign, without understanding the consequences of this decision. This defendant was without the benefit of any additional mitigating evidence that counsel might have been able to find with defendant's assistance, and thus counsel was hampered in her presentation of relevant materials under section 168-n (3).

Being forced to present a defense without the participation of the client doubtless causes an ethical dilemma for defense attorneys. "To be meaningful the right to counsel 'requires the guiding hand of counsel at every step in the proceedings'" (*People v Joseph*, 84 NY2d 995, 997 [1994], citing *Powell v Alabama*, 287 US 45, 69 [1932]). The Court's decision today will require counsel in a SORA proceeding to present their client's defense knowing they have not "guided" their client at all, nor, with the assistance of their client, collected mitigating evidence that would ordinarily be their responsibility to present in support of a defense or an affirmative request for a downward departure. The Appellate Division has held counsel ineffective at SORA hearings where counsel failed to sufficiently communicate with their client (*see e.g. People v Moore*, 208 AD3d 1514, 1515 [3d Dept 2022] [counsel at SORA hearing was ineffective where he "had not had a chance to speak with defendant" and further failed to present a defense]; *People v VonRapacki*, 204 AD3d 41, 44 [3d Dept 2022] [counsel "did not communicate with his client at all" and "essentially agreed to the Board's recommendation"]). The majority's decision ignores our effective assistance of counsel standards by sanctioning an attorney's inability to adequately discuss the defense with their client or seek mitigating evidence based on their client's input— conduct that would be considered ineffective in any other context where assistance of counsel is guaranteed (*see People v Oliveras*, 21 NY3d 339, 344-345 [2013] [counsel in criminal trial was ineffective where he argued that the defendant "was not playing with a full deck" but did not obtain or review any of the defendant's psychiatric records]; *Matter of Mark T. v Joyanna U.*, 64 AD3d 1092, 1093 [2009] *lv denied* 15 NY3d 715 [2010] [assigned counsel in Family Court was ineffective where he represented what he believed

to be in his child client's best interest but revealed he "had neither met nor spoken with the child"]).

The majority's decision also fails to account for and accommodate a mentally disabled offender's right to be present at the SORA hearing, as provided in SORA (Correction Law § 168-n [3]). The prosecution in this case and the Appellate Division in *People v Parris* (153 AD3d 68, 82 [2d Dept 2017])—which the majority cites approvingly (majority op at 9, 12-13)—acknowledged that an incompetent defendant is not "present" to participate in the SORA proceeding. That is correct as an incompetent defendant is present physically but does not possess the mental acuity necessary to understand the proceedings and assist in their defense (*see Drope v Missouri*, 420 US 162, 171 [1975] ["Some have viewed the common-law prohibition" against trials of incompetent defendants "as a by-product of the ban against trials in absentia; the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself"] [internal quotation marks omitted]). Indeed, the SORA court found that during the hearing defendant had "a vacant stare" and did not say "a word to his lawyers." This is not even due process in name only.

The majority recognizes that errors will occur but rather than avoid them up front, unwisely adopts the approach taken in *Parris* and declares that a misclassified offender can simply seek modification on an annual basis (majority op at 9, citing *Parris*, 153 AD3d at 82). A modification hearing is legally inadequate for several reasons. First, a post-deprivation proceeding cannot remedy the due process violation suffered by a mentally

disabled offender who is unable to understand the proceedings and assist in their defense. The hearing held under these circumstances *is* the violation. Indeed, pre-deprivation hearings are the norm. "Due process requires that a person whose constitutional rights are affected by government actions is entitled to be heard and it makes obvious sense in most cases 'to minimize substantially unfair or mistaken deprivations' by insisting that the hearing be granted at a time when the deprivation can still be prevented" (*Lee TT. v Dowling*, 87 NY2d 699, 713 [1996], citing *Fuentes v Shevin*, 407 US 67, 79-82 [1983]). Second, post-deprivation proceedings are particularly inappropriate in cases like this one involving reputational harm (*id*.). That is obvious here because once an individual is classified as a level 2 or 3 offender and placed on the online database, that bell cannot be unrung and the stigma is near impossible to shake off (*Doe v Pataki*, 940 F Supp 3d 603, 626-627 [SD NY 1996] ["the consequences of community notification are unlimited" and cause stigma that "by its very nature pervades into every aspect of an offender's life"]; *see also* Amicus Brief of the Public Defender of New Jersey, *Godfrey v Doe*, 2002 WL 1798881, at *7-21 [2002] [discussing examples of ostracism and vigilante violence against sex offenders]). Third, a modification hearing is meaningless to an offender determined to be incompetent for the rest of their life.

As to the third *Mathews* factor, I agree that the State has an interest in protecting the public from sex offenders (*People v Mingo*, 12 NY3d 563, 574 [2009] [referring to SORA's purpose of protecting the public as a "significan(t) … mission"]). That interest is not furthered by adjudicating defendant's risk level at a time when he is civilly committed in a

secure OMH facility for treatment pursuant to Article 9 and must register as a sex offender now (*see* Correction Law § 168-f). The majority cannot explain how defendant poses a risk to public safety serious enough to outweigh the other *Mathews* factors while he is locked up with no release date in sight.[5] Instead, the majority and the prosecution raise the specter of "dangerous registrants" (who are incompetent) possibly being released into the community for "lengthy periods" without the additional notice that accompanies a SORA level 2 or level 3 classification. To be sure, we must take seriously the legislature's determination that SORA's three-tiered classification scheme effectively serves the critical purpose of "protect[ing] the public from sex offenders" (*Mingo*, 12 NY3d at 574). But the prosecution has offered no details about who this group might include and how sizable it might be, nor has the prosecution answered with any precision why incompetent offenders cannot be treated similarly to other individuals who register first and have their SORA level adjudicated after they are living in the community (i.e., when a person moves to New York from a different jurisdiction or is released from federal custody, or when for some other

---

[5] The prosecution suggests without any data that a risk classification might provide protection to patients, staff, and visitors at his treatment facility. There is no basis to conclude that defendant poses any greater risk to those individuals than he did to corrections officers, other inmates, and visitors while he was in DOCCS custody, nor that the OMH facility's knowledge of a risk level classification would in any way change its treatment or handling of defendant. Staff at secure treatment facilities are aware of their patients' diagnoses and criminal history and are equipped to handle individuals who may pose a danger to others (see OMH Official Policy Manual, Sec. A-3018, Criminal Histories [Aug. 25, 2023] ["To provide a safe environment at OMH facilities criminal histories of adult patients are checked on admission to the facility"]; *see also* Sec. A-3024, Responding to Crisis Situations [Aug. 25, 2023] [explaining OMH policy on "Responding to Behavioral Codes and Psychiatric Crisis Situations"]).

reason a court is unable to hold a hearing prior to the offender's release (*see* Correction Law § 168-l [8]).[6]

Additionally, as we recognized in *Brown*, "[p]opulating the registry with the names and information of individuals who do not pose a danger to children of sexual recidivism undermines the usefulness of the registry and wastes government resources on tracking people who are not the intended targets of SORA nor implicate the public risk and law enforcement needs that first necessitated SORA registries" (2023 WL 8039655 at *10). The usefulness of the registry is similarly undermined when its classification system is inaccurate, and government resources are wasted when individuals who pose a lower risk of recidivism are subjected to the heightened notification requirements of a high-risk classification (*see E.B. v Verniero*, 119 F3d 1077, 1107-1108 [3d Cir 1997] [holding that the government has no "interest in notifying those who will come into contact with a registrant who has erroneously been identified as a moderate or high risk"]). There is no way to guarantee that an offender is accurately assessed when they are not competent to understand the proceeding or participate in their defense.

---

[6] The majority posits that because SORA mandates an "expeditious[]" hearing for such offenders, it cannot permit "indefinite delay[s]" for incompetent offenders (majority op at 9 n 2). The majority misses the point: the sole purpose of the statute is public safety, yet the legislature expressly contemplated that in some cases, strict adherence to its timing scheme would not be feasible and an individual may be living in their community before a risk level hearing can take place. It is illogical to say that, although some offenders will rejoin their community—where they will pose some risk of recidivism—without a risk level adjudication, an incompetent individual who is civilly confined and therefore presents no risk to the public must be adjudicated a risk level upon their transfer from one kind of custody to another.

The majority puts its thumb on the scale in favor of the State's interest in protecting the public by minimizing the harm to a mentally ill offender that inheres in a hearing violative of due process. Indeed, the majority suggests that, because defendant is civilly confined, he is "shield[ed]" from "the public and its stigma" (majority op at 11). First, the majority ignores that the deprivation of defendant's right to counsel and right to be present at his SORA hearing was harm in and of itself. Second, mentally ill sex offenders—including those who are institutionalized—are whole human beings who may still experience stigma and reputational harm. The fact that the public cannot immediately act upon that stigma by denying the offender a job or refusing them service does not render the stigmatizing label meaningless; to the contrary, an erroneous over-classification creates real and practical harms for committed offenders. For example, a high-risk classification increases the risk that an otherwise clinically-appropriate residential treatment setting will deny the offender placement. In this way, an inaccurate classification while hospitalized may doom the offender to commitment more restrictive than their actual risk of recidivism warrants, potentially denying them access to the least restrictive alternative. Indeed, defense counsel represented to the Court that OMH doctors have recommended a nursing home as the "best place" for defendant, but his level 2 classification has "hampered" their ability to find placement for him.

Finally, the majority considers the "additional burdens on the government" posed by "a psychiatric examination and additional hearing to determine a registrant's competency" and the "continual[ ] monitoring [of] registrants found to be incompetent over

long, indefinite periods to determine whether they have regained fitness and can be accurately classified" (majority op at 10). That concern is without factual basis in the record. Indeed, the courts below did not find—nor did the prosecution ever specifically argue—that pre-hearing competency evaluations would burden the State. The defense also represents that, in at least one case, the prosecution agreed that "a registrant is entitled to a competency determination if the SORA court is aware of the possibility of incompetence" (Brief of Appellant at 32, citing *People v Hood*, 35 AD3d 1138 [3d Dept 2006]). Moreover, while administrative burden is a relevant consideration under *Mathews*, it is not enough to override the substantial liberty interest at stake in a SORA proceeding, especially when the offender, as is the case here, is civilly committed at the time of hearing.

IV.

The majority is wrong on the law that due process tolerates a SORA risk classification hearing conducted when the offender is not competent to understand the nature and consequences of the proceeding and is unable to assist counsel with their defense. The majority endorses two systems of justice: one for competent offenders and one less protective for those with mental illness. It is time for the legislature to act where the Court has failed and accord equal rights to mentally disabled offenders.

Order affirmed, without costs. Opinion by Judge Cannataro. Judges Garcia, Singas and Troutman concur. Judge Rivera dissents in an opinion, in which Chief Judge Wilson concurs. Judge Halligan dissents, would apply the *Mathews v Eldridge* (424 US 319 [1976]) balancing test and, doing so, reverse for reasons stated in Part III of the dissenting opinion.

Decided February 22, 2024